1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9    Nitin Patel, M.D., F.A.C.C., an individual;)    No. CV-05-1129-PHX-MHM
     and Cardiac Care, P.C., an Arizona)                CV-05-2926-PHX-MHM
10   Professional Corporation,                     )        (consolidated)
                                                   )
11             Plaintiffs-Counterdefendants, )       **SEALED ORDER**
                                                   )
12   vs.                                           )
                                                   )
13   Verde Valley Medical Center, an Arizona)
     non-profit Corporation; and   Northern)
14   Arizona   Healthcare   Corporation,   an)
     Arizona non-profit corporation,              )
15                                                 )
                                                   )
16             Defendants-Counterclaimants.)
     _____
17   Christian Heesch, M.D., an individual,      )
                                                   )
18             Plaintiff,                          )
                                                   )
19   vs.                                           )
                                                   )
20   Verde Valley Medical Center, an Arizona)
     non-profit Corporation; and   Northern)
21   Arizona   Healthcare   Corporation,   an)
     Arizona non-profit corporation,              )
22                                                 )
                                                   )
23             Defendants.                         )
     _____
24

25          This order addresses Defendants' Motion for Summary Judgment (Dkt.#169),

26   Plaintiffs' Response to this motion (Dkt.#175), Defendants' Reply (Dkt.#194) and the

27   accompanying Statement of Facts (Dkt.#170), attached exhibits, and Plaintiffs' objections

28

thereto and controverting statement of facts (Dkt.#183). Defendants have moved for summary judgment on the federal antitrust claims (Counts VI-IX of the CAC, Dkt. #202), the state antitrust claims (Counts I-IV of the CAC), and other claims for tortious interference with contractual relationships (Count V of the CAC), defamation and injurious falsehood (Counts X, XI, and XVIII of the CAC), breach of contract and the implied covenant of good faith and fair dealing (Counts XII and XIII of the CAC), wrongful institution and maintenance of a non-governmental administrative proceeding (Count XIV of the CAC) and due process and fundamental fairness (Count XV of the CAC).

## I.   Factual Background

Plaintiffs Nitin Patel and Cardiac Care filed suit against Verde Valley Medical Center ("VVMC") and Northern Arizona Healthcare Corporation ("NAH") for allegedly engaging in a variety of anticompetitive tactics in a scheme to "illegally eliminate all competition for inpatient and outpatient cardiology facilities in the market, and to illegally boycott cardiologists who do not exclusively utilize Defendants' cardiology facilities." Plaintiffs' Second Consolidated Amended Complaint ("CAC"), ¶ 1. Plaintiffs' chief complaint is that Defendants' conduct thwarted Plaintiffs' efforts to create and expand a cardiac catheterization lab by denying Dr. Heesch, a physician recruited by Dr. Patel, privileges to perform cardiology procedures which led Dr. Heesch to leave the state of Arizona. CAC, ¶¶ 30, 86-88. Plaintiffs allege that VVMC has market power in the relevant markets for Cardiology Facility Services and Inpatient Care and has engaged in anticompetitive conduct to maintain its market power. CAC, ¶¶ 88-106. Plaintiffs allege that Verde Valley Heart, LLC ("VVH") has market power in the relevant market for Cardiology Professional Services and similarly has engaged in anticompetitive conduct to preserve its market power. CAC, ¶¶ 89, 93 -108. Plaintiffs allege harm to competition and consumers in the provision of Cardiology Facility Services and Cardiology Professional Services. CAC, ¶¶ 110-112.

Defendant VVMC is a non-profit hospital in Cottonwood, Arizona in the Verde Valley. CAC, ¶ 5; Defendants' Statement of Undisputed Facts ("SOF") ¶ 1. Its parent is Defendant NAH. CAC, ¶ 6, SOF, ¶ 2. VVMC offers a broad range of inpatient and outpatient care, including cardiology services.

In or about 1999 VVMC established its Cardiovascular Diagnostic Laboratory where physicians with specified privileges could perform certain limited percutaneous coronary interventional procedures (PCIP) and infarct angioplasties. VVMC offered diagnostic cardiac catheterizations (an invasive procedure which examines the blockage in the arteries). CAC, ¶ 15. In 2001, VVMC added interventional catheterizations, procedures intended to eliminate blockages. VVMC 021297-8 (Ex. G to Defendants' Motion).[1]

The parties' experts agree that at least 40% of the cardiology patients in the Verde Valley region (defined by the Cottonwood Zip Codes identified by the Plaintiffs' expert, Dr. Frech) obtain their cardiology care outside of that region. Frech 2/10/07 Dep. at 183 (Ex. D); Harris Report at 4 (Ex. P); SOF, ¶ 13.

The cardiologists who practiced at the hospital during the relevant period include Defendants Bruce Peek, M.D. and James Dwyer, M.D. Their professional corporation is VVH. CAC, ¶¶ 7-9; SOF, ¶ 4. Dr. Dwyer came to VVMC to begin the interventional program. VVMC 021297 (Ex. G). Dr. Dwyer, Dr. Peek and one of their colleagues, Dr. Butman, provide interventional catheterizations at VVMC. VVH0000019 (Ex. H).

Plaintiff Dr. Nitin Patel is also a cardiologist providing cardiology services in Cottonwood, Arizona. CAC, ¶¶ 2. Dr. Patel was on the staff of VVMC shortly after his

---

[1] For the most part, exhibits with letters are attached to Defendants' Motion and Memorandum of Law in Support of Motion for Summary Judgment or, where indicated, Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment. Numbered exhibits are provided by Plaintiffs as attachments to its Objections to Defendants' Separate Statement of Facts ("Objections") and Controverting Statement Of Facts ("CSOF").

1    arrival in Cottonwood in 1996 until 2004.  Dr. Patel no longer practices at VVMC.  He

2    had active privileges at VVMC until sometime in 2002 when he requested and received

3    consulting privileges.  Patel 7/25/06 Dep. at 292 (Ex. 6)  He again received active

4    privileges in or about June, 2003  (Exs. 88-91) and cardiac cath privileges sometime later.

5     Patel 7/25/06 Dep. at 305-11 (Ex. 6); (Ex. 92)  After an incident involving a pacemaker

6    in June 2004, Dr. Patel voluntarily resigned his cardiac cath privileges in July, 2004,

7    (VVMC 11225 (Ex. E); SOF, ¶ 24), and his active privileges in September, 2004.  Patel

8    7/25/06 Dep. at 311 (Ex. 6)  However, Dr. Patel and his practice, Plaintiff Cardiac Care,

9    P.C., continue to provide cardiology services in Cottonwood.  Patel 7/24/06 Dep. at 151-

10   52 (Ex. A).  In or about 2001 Dr. Patel began planning to build his own facility for

11   performing cardiac catheterization procedures[2] but the facility was never completed.

12   CAC, ¶23.  Frech Rep. at 4 (Ex. Q ).  Dr. Patel and Cardiac Care used an outpatient

13   diagnostic facility that competed with VVMC, and they referred  catheterizations to

14   hospitals in Phoenix, including Arizona Heart Hospital.  CAC,¶ 22; SOF, ¶ 23; Patel

15   7/24/06 Dep. at 78 (Ex. A).

16        In late 2001, Dr. Patel recruited Dr. Christian Heesch, a cardiologist, to perform

17   cardiac catheterizations for Cardiac Care's patients.  CAC, ¶¶ 16 -17; SOF, ¶ 28.  Dr.

18   Patel intended that with Dr. Heesch on the staff at VVMC, Dr. Patel would have

19   catheterizations for his patients done at VVMC, rather than in Phoenix.  Patel 7/24/06

20   Dep. at 99-103 (Ex. 6); Frech 2/10/07 Dep. at 109-111 (Ex. D); SOF, ¶ 29.  Dr. Heesch

21   was granted temporary privileges on November 27, 2001.  (Ex. 16)  On December 18,

22   2001, Dr. Heesch's temporary privileges were revoked by Dr. Owens, the President of

23   VVMC, and the Medical Executive Committee ("MEC") of VVMC recommended that

24   his application for permanent privileges be denied because of (1) violations of VVMC

25   _____

26       [2] This facility would have provided only outpatient services.  Harris Rep. ¶ 27 at 15
     (Ex. 116).

27                                      – 4 –

28

1   bylaws, including allegations that he performed medical services outside the approved

2   scope of his privileges; (2) failure to discharge medical staff responsibilities by refusing

3   to participate in hospital quality processes; (3) lack of qualifications to provide best

4   possible care, specifically failure to orient to equipment, staff and transfer protocols of the

5   Cardiac Cath Lab; and (4) failure to cooperate with hospital personnel (disruptive

6   behavior).  VVMC 00245 (Ex. I, 44).  On December 19, 2001, Dr. Heesch requested an

7   appeal.  (Ex. 135)

8          An Ad Hoc Committee was appointed, and after a series of hearings of

9   approximately 90 hours the Ad Hoc Committee on August 18, 2002 found that Dr.

10  Heesch (1) violated the bylaws by performing services outside the scope of his privileges,

11  (2) engaged in disruptive behavior, and (3) failed to disclose in his application to VVMC

12  (VVMC 00074 (Ex. 15)) that "his ability to practice at the University of Pittsburgh

13  Medical Center and the VA Hospital was restricted".  PAT 00001 (Ex. J).  The Ad Hoc

14  Committee disagreed with  the severity of the MEC's recommendations and

15  recommended that Dr Heesch be granted privileges if he agreed to meet certain

16  conditions. PAT 00005 (Exs. J, 60). On September 11, 2002, MEC submitted a Consent

17  Agreement (PAT OOO88 (Ex.62)) to Dr. Heesch, which he did not accept within the time

18  period required by the MEC.  On November 18, 2002, the MEC recommended to the

19  Board that Dr. Heesch's privileges be denied.  PAT 01423 (Ex. 47).  On December 3,

20  2002,  the Board denied Dr. Heesch's privileges on the grounds that Dr. Heesch failed to

21  disclose pertinent information and performed procedures for which he did not have

22  privileges. CAC, ¶¶ 56, 62-63, 67, 79; VVMC 002455 (Ex. I); PAT 00001 (Ex. J); Dec. 3,

23  2002 Meeting Minutes (Ex. K); SOF, ¶ 30.

24          On December 12, 2002, VVMC reported its adverse action against Dr. Heesch to the

25  National Practitioner Data Bank ("NPDB"). (Ex. 79)  VVMC also filed two different reports

26  with the Arizona Medical Board of Examiners ("BOMEX")(Exs. 58, 72), which investigated

27  Dr. Heesch and determined in June 2002 and December 2003 that he had not violated the

28

1    Arizona Medical Practice Act.  (Exs. 68, 69, 59). Dr. Heesch left the Cottonwood area in

2    March, 2003. Patel 7/24/06 Dep. at 60 (Ex. A).

3        In 2004, Dr. Patel added another interventional cardiologist, Dr. Kumar Ravi, to

4    his practice. VVMC021266 (Ex. L).  Dr. Ravi was granted by VVMC general medical

5    staff privileges in cardiology and privileges to perform diagnostic catheterizations at

6    VVMC.  Ravi Dep. at 78 (Ex. M); SOF, ¶ 37.  Again, Dr. Patel's intention was to have

7    most of his catheterizations, which had been performed in Phoenix, performed by Dr.

8    Ravi at VVMC.  Patel 7/24/06 Dep. at 72-76 (Ex. A); Patel Dep. Ex. 3 (Ex. T); SOF, ¶

9    38.  However, after a routine review of his initial interventional cases, Dr. Ravi was asked

10   by VVMC to have more cases monitored.  NP005144 (Ex. N).  Dr. Ravi voluntarily

11   resigned his medical staff privileges at VVMC in September 2004.  NP005148 (Ex. O);

12   SOF, ¶ 39.  In March 2005, Dr. Ravi decided to move to Phoenix, where he continues to

13   perform catheterizations for Dr. Patel's patients.  Ravi Dep. at 11 (Ex. M); Patel 7/24/06

14   Dep. at 74-75 (Ex. A); SOF, ¶ 40.

15       Since losing Dr. Heesch, Dr. Patel has added two physicians to his staff, including

16   Dr. Sharma, a new cardiologist, and is recruiting more.  Patel 2/7/07 Dep. at 22, 98 (Ex.

17   F); SOF, ¶ 25.

18       Plaintiffs filed their complaint on April 14, 2005.  Defendants moved for summary

19   judgment on Plaintiffs' antitrust claims on two principal grounds: (1) Defendants do not

20   have the market power required for Plaintiffs' antitrust claims to succeed; and (2) All of

21   the antitrust claims should be dismissed because Plaintiffs have not suffered antitrust

22   injury.  Defendants assert other grounds for dismissing the antitrust claims, including the

23   Health Care Quality Improvement Act, and the other state law claims, which are

24   discussed below.  Defendants' Motion and Memorandum of Law in Support of Motion

25   for Summary Judgment ("Defendants' Memorandum").

26

27                                           – 6 –

28

## II.   Summary Judgment Standards

A motion for summary judgment may be granted only if the moving party shows "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To defeat a motion for summary judgment, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court is required to view the facts in a light most favorable to the non-moving party. *Rebel Oil Company v. Atlantic Richfield*, 51 F.3d 1421, 1432 (9th Cir. 1995). The party opposing summary judgment "may not rest upon mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

The definition of the relevant market is a factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility. *High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). However, that an issue is factual does not necessarily preclude summary judgment. If the moving party shows that there is an absence of evidence to support the plaintiff's case, the nonmoving party bears the burden of producing evidence sufficient to sustain a jury verdict on those issues for which it bears the burden at trial, not just showing that there is an issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 324-25 (1986). If Plaintiff's evidence cannot sustain a jury verdict on the issue of market definition, summary judgment for the Defendant is appropriate. *Rebel Oil*, 51 F.3d at 1432. This rule does not direct courts to resolve questions of credibility or conflicting

– 7 –

1  inferences.  What it requires courts to do is assess whether the jury, drawing all inferences in

2  favor of the nonmoving party, could reasonably render a verdict in favor of the nonmoving

3  party in light of the substantive law.  *Anderson*, 477 U.S. at 249-52.  The determination

4  requires application of the standard that courts apply in motions for a directed verdict or a

5  judgment notwithstanding the verdict.  *See id.* at 251.

6      As a preliminary matter, an expert opinion is admissible[3] and may defeat summary

7  judgment if it appears that the expert is competent to give an expert opinion and that the

8  factual basis for the opinion is stated in the report.  *Bulthuis v. Rexall Corp.*, 789 F.2d

9  1315, 1317 (9th Cir. 1985).  When an expert's report meets this basic standard, the

10  inference to be drawn from the expert's report must, as *Anderson* requires, be sufficient to

11  support a favorable jury verdict.  In the context of antitrust law, if there are undisputed

12  facts about the structure of the market that render the inference economically

13  unreasonable, the expert opinion is insufficient to support a jury verdict.  *Eastman Kodak*

14  *Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 112 S. Ct. 2072, 2083, 119 L. Ed. 265

15  (1992).  As the Supreme Court explained:

16      When an expert opinion is not supported by sufficient
    facts to validate it in the eyes of the law, or when indisputable
17      record facts contradict or otherwise render the opinion
    unreasonable, it cannot support a jury's verdict.   Expert
18      testimony is useful as a guide to interpreting market facts, but it
    is not a substitute for them.  As we observed in *Matsushita*,
19      'expert opinion evidence . . . has little probative value in
    comparison with the economic factors' that may dictate a
20      particular conclusion.

21  *Brooke Group v. Brown & Williamson Tobacco Co.*, 113 S. Ct. 2578,  2598 (quoting

22  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n. 19, 89 L. Ed.

23  2d 538, 106 S. Ct. 1348 (1986)).  The inquiry is whether the inference to be drawn from

24  _____

25      [3] Defendants have separately moved to exclude the expert testimony of Dr. Frech on
    the grounds that his testimony fails to comply with the standards of Federal Rule of

26  Evidence 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).  The Order with
    respect to that motion is being filed simultaneously with this Order.

27

28                              – 8 –

expert's opinion is "reasonable given the substantive law which is the foundation for the claim or defense." *See Richards v. Neilson Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). As the court noted in *Rebel Oil*, 51 F.3d at 1440, "Assertions in expert affidavits do not automatically create a genuine issue of material fact." The court is obligated to look at the record to determine, whether in light of undisputed facts, the inferences to be drawn from the expert's affidavit are reasonable. *Id*.

**III.    Geographic Market**

The Defendants argue that the Court should dismiss the Plaintiffs' monopolization, attempted monopolization and tying claims, Counts I, II, IV, VI, VII, and IX, because the Plaintiffs lack the requisite market power needed for such actions. The burden of establishing that a specified area constitutes a relevant geographic market rests with the Plaintiffs. *Rebel Oil Co*, 51 F.3d at 1434; *Rutman Wine Co. v. E.&J. Gallo Winery,* 829 F.2d 729, 736 (9th Cir. 1987).

In order to succeed on these claims, Plaintiffs must show that Defendants had either monopoly or market power in a relevant market. In particular, Plaintiffs claim that the Defendants violated Section 2 of the Sherman Act by unlawfully monopolizing or attempting to monopolize Cardiology Facility Services and Cardiology Professional Services in the Cottonwood Area. In order to establish unlawful monopolization, the plaintiffs must show that the defendants: (1) possess monopoly power in a relevant market; and (2) and have obtained or maintained that power by use of exclusionary conduct. *Verizon Communs. v. Law Office of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Eastman Kodak Co. v. Image Technical Serv.*, 504 U.S. 451, 481 (1992). "Monopoly power" has been traditionally defined as "the power to control prices or exclude competition." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956). A supplier is said to have market power if it has the ability to increase

profits by raising price or lowering quality from the levels that would prevail under competition.  Frech Rep. at 24 (Ex. D).

Monopoly power can be proven by direct or circumstantial evidence.  *Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). Circumstantial evidence of market power requires that the plaintiff define the relevant market.  *Rebel Oil Co*, 51 F.3d at 1434.  Plaintiffs argue that the relevant geographic market is the area immediately in and around Cottonwood, Arizona, and that Defendants enjoy monopoly power in that market or, alternatively, that there is direct evidence of Defendants' monopoly power.  Defendants argue that Defendants compete in a broad market that includes Phoenix hospitals and cardiologists.  Since Defendants are only one hospital and one physician practice among many in the relevant markets, they could not possibly have the requisite power or cardiology market share.  Each of these arguments will be addressed separately.

Plaintiffs' complaint alleges three product markets:  (1) Cardiology facility services; (2) inpatient care services[4]; and (3) cardiology professional services. CAC, ¶¶ 91-94.  Cardiology Facility Services are defined to include the provision of cardiology facilities and equipment, including procedures and tasks performed by nurses and other technical staff at the cardiology facility using the facility's equipment.  CAC, ¶ 91; Frech Rep. at 1-2 (Ex. Q).  The Plaintiffs' complaint does not distinguish between inpatient and outpatient Cardiology Facility Services.  Dr. Frech testified that Cardiology Facility Services is not limited to inpatients. Frech 2/10/07 Dep. at 137 (Ex. D).  Cardiology Facilities are hospitals and freestanding medical facilities and staff that have the necessary equipment to perform various invasive and non-invasive procedures

---

[4] Plaintiffs claim that general acute care hospital facilities represent a relevant product market.  However, plaintiffs do not claim that VVMC has monopolized general acute care hospital facilities.

and services, including but not limited to cardiac catheterization procedures and services. Frech Rep. at 7 (Ex. Q). Cardiology Professional Services are defined to include the provision of cardiology care to patients by cardiologists, consisting of specialized medical care focused on the body's circulatory system, particularly the heart. CAC, ¶ 93; Frech Rep. at 2 (Ex. Q). Cardiology Professional Services include procedures classified as invasive, non-invasive, interventional or peripheral cardiology.[5] Frech Rep. at 11 (Ex. Q). Defendant VVMC competes in Cardiology Facility Services and inpatient care services, and Plaintiff Cardiac Care competes in outpatient Cardiology Facility Services. Both Plaintiff Cardiac Care and Defendant VVH compete in Cardiology Professional Services. At least for purposes of their motion, Defendants do not dispute these product markets.

In order to determine the relevant geographic market for Cardiology Facilities Services and for Cardiology Professional Services, it is necessary to determine "*the geographic area in which the defendant faces competition* and to which consumers can practically turn for alternative sources of the product." *Baxley-DeLamar Monuments, Inc. v. American Cemetery Ass'n.*, 938 F.2d 846, 850 (8th Cir. 1991) (emphasis added) citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). *See also* Frech

---

[5] Plaintiffs' expert, Dr. Frech, explains, "Invasive cardiology involves the use of catheterization to examine the cardiovascular system of the patient. The catheter, essentially a small tube, is inserted through the skin of the patient and fed through arteries to the heart. There, the cardiologist can release dye that is readable by diagnostic imaging equipment such as X-rays. This allows visualization of the heart and circulatory system in action. Examples of non-invasive cardiology procedures are: nuclear imaging, electrocardiograms, echocardiography, event monitors, and 24-hour Holter monitoring. These various procedures and tests are overseen, and the results interpreted, by cardiologists. Interventional cardiology involves the use of catheters to perform non-surgical procedures for treating cardiovascular disease, such as balloon angioplasty. Peripheral cardiology deals with areas of the body away from the heart, such as arteries in the leg or neck." Frech Rep. at 11 (Ex. Q).

1   2/10/07 Dep. at 165 (Ex. D); *Thurman Industries, Inc. v. Pay N Pak Stores, Inc.*, 875

2   F.2d 1369, 1374 (9th Cir. 1989) (a market involves identification of the field of

3   competition:  the group or groups of sellers or producers who have actual or potential

4   ability to deprive each other of significant levels of business).  A geographic market is

5   an area of effective competition. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F. 3d 995,

6   1016 (6th Cir. 1999).  Although the definition of the market is ordinarily a factual

7   inquiry, courts have not hesitated to grant summary judgment where the geographic

8   market alleged by the plaintiffs is implausible.  *Miller v. Indiana Hosp.*, 814 F. Supp.

9   1254, 1264 (W.D. Pa. 1992)(motion for summary judgment granted where court finds

10  evidence insufficient to establish a relevant geographic market when defendant's expert

11  showed that 40% of patients went outside of plaintiff's alleged market). *See also Rebel*

12  *Oil*, 51 F.3d at 1440 (court granted summary judgment where indisputable record facts

13  contradict the expert in establishing a relevant product market).

14          According to Dr. Frech, Plaintiffs' expert, Verde Valley is about 100 miles north

15  of Phoenix.  Prescott, Arizona, where Yavapai Regional Medical Center ("YRMC") is

16  located, is between Cottonwood and Phoenix and is about 45 miles south of

17  Cottonwood.  YRMC has a Cardiac Catheterization Lab and Angiography Service.

18  Flagstaff, Arizona, where VVMC's sister hospital Flagstaff Medical Center is located,

19  is about 69 miles north of Cottonwood and the Verde Valley.  Frech Rep. at 16 (Ex. Q).

20  According to VVMC documents, the primary service area for VVMC cardiovascular

21  services includes the regions of Cottonwood and Sedona; the secondary service area

22  includes Prescott and Prescott Valley.  VVMC 021295 at 7 (Ex. G);  VVMC documents

23  also identified hospitals in Phoenix as its competitors in cardiology.  Frech 2/10/07 Dep.

24  at 186-187 (Ex. D); VVMC 021303-04 (Ex. G); VVMC 016823 (Ex. 87).  VVMC

25  documents also indicate that Prescott was a new market that NAH at one time was

26

27

28                                      – 12 –

1  interested in entering, in hopes of capturing some of Prescott's specialty care that

2  currently was going to Phoenix for services, including Cardiology Facility Services,

3  where the estimated "leakage" to Phoenix was 34%.  Frech Rep. at 17-18 and n. 37, 39

4  (Ex. Q); VVMC 030223 at 3, 13 (Ex. 129).  Even as of June 2005 a VVMC

5  Cardiopulmonary Cath Lab department survey notes that "Arizona Heart Institute

6  continues to be an aggressive competitor."  VVMC 009050 (Ex. C).

7        Dr. Frech determined that the relevant market for Cardiology Facility Services

8  was what he called the "Cottonwood Area" that he said coincided with the one listed

9  and portrayed on VVMC service area maps and in VVMC documents.  Frech Rep. at 19

10  (Ex. Q).  In support of this market definition, Dr. Frech cites as one factor the location

11  of the patients who come to VVMC for cardiology services.  According to Dr. Frech the

12  "Cottonwood Area" is a "self-contained" area, which includes 15 zip codes, all of which

13  are in Yavapai County except the eastern portions of zip codes 86336 and 86024, which

14  are in Coconino County.  Frech Rep. at 17; Ex. 9 (Ex. 9).  Dr. Frech also notes this area

15  is "similar to the idea of a 75 percent LIFO[6]. . ."  *Id.*  However, as Dr. Frech

16  acknowledges (Frech 2/10/07 Dep. at 164-65, 185 (Ex. D)), absent more, a primary

17  service area does not necessarily equate to a relevant geographic market for antitrust

18  purposes.  *Gordon v. Lewistown Hospital,*  423 F.3d 184, 212 (3d Cir. 2005).

19        One of the criticisms of Dr. Frech's analysis is that Dr. Frech's geographic

20  market definition is not supported by the available patient origin data.  In rebuttal Dr.

21  Frech admits that he includes some zip codes that have very few VVMC cardiology

22  discharges but ignores others that have a larger number of VVMC cardiology

23  discharges.  Frech Rebuttal at 72-75 (Ex. 8).  Dr. Harris, Defendants' expert, notes this

24  _____

25        [6]  As discussed more fully below, "LIFO" ("Little In From Outside") is one of the two
       measurements in the Elzinga-Hogarty test that is sometimes used to determine a geographic

26  market.  In this case a LIFO of 75% means that 75% of the patients at hospitals in the area are

27

28                                          – 13 –

1   and claims that these other zip codes should be included because of their larger number

2   of discharges and because a larger LIFO is required.  Although Dr. Frech offers an

3   explanation for the zip codes he includes and excludes,[7] collectively, the excluded zip

4   codes are not insignificant representing as much as 17% of VVMC's discharges.[8]

5       More importantly, a large portion of patients from virtually every zip code in

6   VVMC's service area, including Cottonwood itself, used Phoenix hospitals for

7   cardiology services available at VVMC.[9]  For example, even in zip code 86326, where

8   _____

9   from the area.

        [7] For example, from 2001-2005 zip codes 86024 (Happy Jack), 86017 (Munds Park)
10  and 85931 (Forest Lakes), which are included in Dr. Frech's geographic market,  have
    fewer than five inpatient discharges whereas zip codes 86314 (Prescott Valley), 86004
11  (Flagstaff), 86333 (Mayer), 86303, 86305, and 86301 (all Prescott) all have over 24
    cardiology inpatient discharges but are not included.  Harris Rep. at 43 (Ex. 116).  Dr.
12  Frech defends the inclusion of the smaller zip codes as being either "point zip codes"
13  (assigned to a building like a post office) or as, in the case of 86024, entirely surrounded by
    86336 (Sedona), an included zip code.  Frech Rebuttal at 110-111 (Ex. 8).  Dr. Harris'
14  report identifies twelve zip codes which account for five or more cardiology discharges
15  from VVMC that are not included in Dr. Frech's Cottonwood Area. Harris Rep. at 43 (Ex.
16  116).  As far as the excluded zip codes are concerned, Dr. Frech indicates that "the
    percentage of discharges from each at VVMC, was low, below 5 percent in each case."
17  Frech Rebuttal at 110-111 (Ex. 8).
        [8] Frech Rebuttal at 11-112 (Ex. 8). This leads to a discussion of critical loss and
18  whether loss of a sufficient percentage of those patients (the critical loss) would constrain
19  prices.  Dr. Frech indicates that there is a "silent majority" that would not be affected by a
    price increase, but as Dr. Frech admits, no case has acknowledged this theory, particularly
20  with little or no economic analysis to support it.  Moreover, the argument ignores
    differences in quality which are more difficult to quantify but are also relevant to
21  competition in the market.  Dr. Frech merely states that the silent majority fallacy
22  postulates that perceived higher quality is one cause for some non-price sensitive group of
    patients to travel outside of the relevant market, Frech Rebuttal at 117 (Ex. 8), which only
23  presents a circular argument.
24      [9] The inpatient data for patients receiving multiple cardiology procedures who could
    have received all the procedures at VVMC are shown in Exhibits 28-37 of Dr. Harris'
25  report. *See* Harris Rep., Exs. 28-37 (Ex. 116). For some of the zip codes that Dr. Frech has
26  omitted, the number of patients that chose to go to Phoenix is higher. *See* Frech Rep. Ex.
    57 (Ex. Q).
27
                                    – 14 –
28

VVMC is located, cardiology patients travel to an alternative hospital in Phoenix.  For example, for commercial payors, the data show that at least 24% of the cardiology inpatient discharges attributable to patients residing in zip code 86326 alone are from hospitals in Phoenix:[10]

**Discharges of Patients Receiving VVMC Multiple Cardiology Procedures**
**Commercial Payors**

Where These Patients from Zipcode 86326 – Cottonwood -- Traveled

| Year | Total | To VVMC | | To Phoenix Hospitals | |
|------|-------|---------|--------|------|--------|
| 2001 | 41 | 21 | 51.2% | 16 | 39% |
| 2002 | 45 | 16 | 35.6% | 19 | 42.2 % |
| 2003 | 70 | 26 | 37.1% | 31 | 44.28% |
| 2004 | 62 | 32 | 51.6% | 15 | 24.19 % |
| 2005 | 60 | 34 | 56.7% | 16 | 26.6 % |

Plaintiffs argue that the 40% patient outflow is due in part to cardiology services that were not performed at VVMC.  However, the data shown above from defendants' expert, Dr. Harris, was limited to only those procedures performed at VVMC. Harris Rep., Exs. 28-37 (Ex. 116).  Dr. Harris explains that he analyzed the data in three ways (1) all cardiology procedures regardless of whether they were performed at VVMC; (2)

---

[10] Harris Rep. Exs. 33-37 (Ex. 116).  *See also* Harris Rep. Exs. 8- 37 (Ex. 116) for discharges of inpatients receiving cardiology procedures, VVMC cardiology procedures, and VVMC multiple cardiology procedures for all payers and for commercial payors; Harris Dep. at 172-181, 187-189 (Ex. 117).

1   cardiology procedures where at least one procedure was performed at VVMC; and (3)
2   where all of the cardiology procedures were performed at VVMC (referred to by Dr.
3   Harris as "VVMC Multiple Cardiology Procedures"). Harris Dep. at 172-181, 187-189
4   (Ex. 117). In particular, Dr. Harris noted that his "whole analysis was focusing on
5   procedures other than cardiac surgeries" because VVMC "doesn't offer cardiac
6   surgery." *Id.* at 173 (Ex. 117).
7        Although Dr. Frech expressed some caution in using patient flows (and the
8   Elzinga –Hogarty method) to determine the relevant geographic market, Dr. Frech says
9   that patient flow data "is useful to aid in understanding or confirming a proposed
10  relevant geographic market." Frech Rep. at 19 (Ex. Q). Based on Arizona patient flow
11  data from INTELLIMED, Dr. Frech admitted that the Cottonwood Area for Cardiology
12  Facility Services had a LIFO[11] of 83.7 percent and LOFI of 59.7 percent. Frech Rep. at
13  21; Ex. 10 (Ex. Q). Nevertheless, Dr. Frech concluded:
14

---

15       [11] Elzinga-Hogarty ("E-H") employs two tests, both of which must hold for an area
16  to be considered a market. The LIFO ("Little In From Outside") test means that the
    hospitals in the area service few patients from outside the area. Traditionally, under E-H, a
16  geographic area passes the LIFO test if 90% or more of the services provided by the
17  hospitals in the area are to patients in the area. The LOFI ("Little Out From Inside") test is
    the percentage of patients in the area who obtain their care from hospitals within the area.
18  Traditionally, like the LIFO test, under E-H an area passes the LOFI test if 90% or more of
19  the patients within that area obtain services in that area. A "weak" version of the E-H test
    requires LIFO and LOFI statistics of at least 75%. For an area to be considered a relevant
20  geographic market for antitrust purposes under the E-H methodology, both the LIFO and
21  LOFI tests must be passed simultaneously. It should be noted that the use of these terms,
    LIFO and LOFI, can be confusing. The usual definition refers to flow of products rather
22  than the flow of patients, which is contemplated here. Thus, the definitions can be
23  reversed. H.E. Frecht, III, James Langenfeld, R. Forrest McCluer, *Elzinga-Hogarty Tests*
24  *and Alternative Approaches for Market Share Calculations in Hospital Mergers*, 71
    Antitrust L.J. 921, 926-932. *See* Harris Rep. fn. 34 at 22 (Ex. 116). However, the point
25  with respect to Dr. Frech's testimony is that approximately 40% of patients in the area
26  defined by Dr. Frech as the geographic market leave the area to obtain cardiology services
    elsewhere.
27
28                                      – 16 –

1

2         Along with the geography of the area, and VVMC's delineation
of their primary service area, these patient flow statistics provide

3         further evidence for the Cottonwood Area as a self-contained
relevant geographic market for Cardiology Facility Services that

4         is relevant for antitrust purposes.

5    *Id.*

6        Dr. Frech also noted that the Cardiology Professional Services market is

7  generally the same or smaller than the market for Cardiology Facility Services.  Using

8  patient flow statistics – in particular inpatient discharge data from INTELLIMED as a

9  proxy for outpatient visits for Cardiology Professional Services, Dr. Frech determined

10  that the aggregated LIFO from 2001-2005 for the Cottonwood Area for Cardiology

11  Professional Services was 68.3 % and the aggregated LOFI for the same period was

12  72%.  *Id.* at 24 (Ex. Q).[12]

13        Thus, Plaintiffs' own data show that about 28% of the cardiology patients in the

14  Cottonwood Area seek cardiologists outside the area and at least 40% of cardiology

15  patients in the Cottonwood Area receive cardiology services at hospitals or facilities

16  other than VVMC and thus outside the Cottonwood Area for the same cardiology

17  services provided at VVMC.  Only "about 59%" of patients in the Cottonwood Area get

18  cardiology treatment at VVMC.  Frech 2/10/07 Dep. at 183 (Ex. D); SOF, ¶ 13.  Dr.

19  Frech further admitted  that "a significant number" of patients choose between Phoenix

20  hospitals and VVMC.  Frech 2/10/07 Dep. at 189 (Ex. D).  He explained this in part by

21  saying:

22         The fact that the LOFI percentages are lower than LIFO is to be
expected, as there are hierarchical outflows to Phoenix.  These

23         may result from perceptions of quality differences between city
and rural hospitals.  After VVMC, the biggest-drawing hospital

24  ──────────────────────

        [12]   While the LOFIs for both Cardiology Facility Services and Cardiology

25  Professional Services indicate that a broader market should be defined, the LIFO for

26  Cardiology Professional Services also suggests that a broader market definition is required.

27

28

1
2
3
4
5
6
7

> for Cardiology Facility Services from the Cottonwood Area is
> Arizona Heart Hospital in Phoenix.  The flows there are larger
> than those to VVMC's sister facility in Flagstaff.   One
> explanation for this is that Drs. Patel, Heesch, and Ravi had to
> send many of their patents to Phoenix hospitals when, because
> of actions taken by Defendants, they felt it unwise to refer
> patients to VVMC because of the risk of losing them to VVH
> cardiologists, particularly Drs. Dwyer and Peek.  Another factor,
> according to VVMC is that Phoenix cardiology hospitals have a
> statewide reputation for high quality care.  A further possible
> reason might be family, social and economic connections to
> Phoenix.

8   Frech Rep. at 22 (Ex. Q).

9        Dr. Frech's explanation, however, does not support excluding the Phoenix

10  hospitals from the relevant market.[13]  Rather, it indicates the contrary – that VVMC

11  competes with Phoenix hospitals in Cardiology Facility Services.  This fact alone shows

12  the presence of competition between VVMC and the hospitals in Phoenix.  As the court

13  noted in *Re/Max*, 173 F. 3d at 1016, "when the evidence indicates that a large

14  proportion of consumers within the proposed area in fact turn to alternative sources of

15  supply outside the proposed area, the market boundaries posited by the plaintiff must be

16  rejected."

17       Despite these admissions, Plaintiffs argue that the geographic remoteness of the

18  Cottonwood area – the distance, mountainous terrain, and traffic congestion around

19  Phoenix -- combined with the age and condition of cardiology patients, supports a

20  narrower geographic market.  However, Dr. Patel himself testified that as of July, 2006

21  his practice was "providing over 500-600 interventions" including "cardiac

22  catheterization and interventions, stents, angioplasties, PTCA" per year to hospitals in

23

24       [13] Dr. Frech also stated that Arizona Heart Hospital's share of the market was only
important from the "demand side" and that it is the supply side that is most consistent with
25  the Merger Guidelines, Frech 2/10/07 Dep. at 190-91 (Ex. D), which is incorrect.  Dr.
26  Frech also admits that Arizona Heart Hospital is the "next closest competitor" to VVMC.
     *Id.* at 192.
27

28                                       – 18 –

Phoenix.  Patel 7/24/06 Dep. at 78 (Ex. A); SOF, ¶ 8.  Many of his patients are treated at

Arizona Heart Institute, but he also refers some patients to John C. Lincoln Hospital and

Paradise Valley Hospital, which are located in the northern part of the Phoenix

metropolitan area.  Patel 7/24/06 Dep. at 74-75 (Ex. A).  Indeed, Dr. Ravi, Cardiac

Care's former employee, provides cardiac catheterizations in Phoenix for Cardiac

Care's patients.  *Id.*;  SOF, ¶ 10; Ravi Dep. at 11-13 (Ex. M).  While practicing in

Phoenix, Dr. Ravi also has office hours in Cottonwood one day a week.  Plaintiffs'

Objections,  ¶ 12.

Also, Dr. Mackin, a cardiologist based in Flagstaff, Arizona, which is even

farther from Phoenix than is Cottonwood, sends "all the diagnostic caths and all

interventions" of his Flagstaff and rural Northern Arizona patients to Phoenix.  Mackin

Dep. at 52 (Ex. R); SOF, ¶ 11; Plaintiffs' Objections, ¶ 11.  In the last two years, only

three of Dr. Mackin's approximately 450 such patients have refused to travel to Phoenix

for cardiology services.  *Id.* at 51-53; SOF, ¶ 12; Plaintiffs' Objections, ¶ 12.  These

referrals of cardiology patients to the Phoenix area support a broader, rather than

narrower, geographic market.

Defendants cite a number of cases to support their position that this outflow of

patients to Phoenix indicates that the geographic market is broader than the Plaintiffs

propose.  *See United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 141-42

(E.D.N.Y. 1997) (where the court included Manhattan in the tertiary care market where

statistics revealed that only "15 percent of tertiary care patients from Queens, Nassau

and Suffolk went to Manhattan hospitals"); *FTC v. Tenet Health Care Corp.*, 186 F.3d

1045, 1053 (8th Cir. 1999) (where the court rejected the FTC's market definition

because 22% of the "people in the most important zip codes already use hospitals

outside of the FTC's proposed market"); *Miller*, 814 F. Supp. at 1264 (where the court

rejected a monopolization claim, in part, because Plaintiff alleged a geographic market that consisted only of Indiana County, but "40 percent of the residents of [the] County who were hospitalized" went to hospitals outside of Indiana County). *See also United States v. Mercy Health Servs.*, 902 F. Supp. 968, 979, 983 (N.D. Iowa 1995) (where the court rejected the plaintiffs' market because "one third" of patients from "several zip codes" traveled outside the plaintiffs' alleged market), *vacated as moot*, 107 F.3d 632 (8th Cir. 1997).

Of these, the one most relevant is *Miller v. Indiana Hospital*, 814 F. Supp. 1254 (W.D. Pa. 1992), where the district court granted the defendant hospital's motion for summary judgment on plaintiffs' claims under both Sections 1 and 2 of the Sherman Act because plaintiff could not sustain his definition of the relevant geographic market because 40% of the patients went outside Indiana County, despite mountainous terrain and poor road conditions.  The court found that summary judgment was appropriate given that this evidence would prevent a jury from finding for the plaintiff at trial.

Defendants also cite *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994), where a jury verdict on monopolization of adult cardiac surgery in Lincoln, Nebraska was overturned for failure to include Omaha, Nebraska (60 miles away) in the relevant geographic market.  These plaintiffs had proposed a relevant geographic market of 26 counties extending in certain directions over 200 miles beyond Lincoln.  While the plaintiff had produced evidence that "cardiologists in Lincoln seldom refer their patients to cardiac surgeons in Omaha," this was insufficient in light of the evidence that there was considerable competition between the regions, and that the plaintiff himself often traveled to Omaha to perform procedures. *Id.* at 1296-97.  The Eighth Circuit held that that method of defining the geographic market was invalid as a matter of law because it did not address where patients could practically turn for alternatives. *Id.* However,

– 20 –

1   there was no question that the relevant geographic market included those counties

2   where Lincoln residents "*actually* went," as opposed to where they "*could* practically

3   go." *Id.*

4          Plaintiffs argue that Dr. Patel's referrals to Arizona Heart Institute in Phoenix

5   cannot be used to expand the market, but the cases Plaintiffs cite do not support their

6   argument.  In two of the cases, *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th

7   Cir. 1988) and *Defiance Hospital, Inc. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097

8   (W.D. Ohio 2004), the court defined the geographic market in which to assess an

9   exclusive anesthesiology contract with the hospital (i.e., a hospital-based contract,

10  which is not at issue here) and therefore did not consider patient outflow.  In *Oltz* the

11  court noted that "there was *no evidence* that patients could effectively turn outside of St.

12  Peter's for alternative sources of anesthesia services." 861 F.2d at 1447-48 (emphasis

13  supplied).  In *Defiance* the court found that, given the exclusive contract, the hospital

14  was the consumer of anesthesiology services, 344 F. Supp. 2d at 1111, and thus it did

15  not need to consider the outflow of patients.  This is not the situation here where there is

16  no exclusive contract with the hospital and the relevant geographic market is necessarily

17  determined by the competitors cardiology patients choose.  In *FTC v. Staples*, 970 F.

18  Supp. 1066, 1073 (D.D.C. 1997), the court looked to direct evidence of higher prices

19  where there were no competing superstores to define the market and determine

20  monopoly power.[14]  In cases where there is direct evidence of monopoly power, market

21

22  _____

23          [14] *McKenzie Willamette Hosp. v. PeaceHealth*, 2004 U.S. Dist. LEXIS 20980 (D.
    Ore. Oct. 13, 2004), which the Plaintiffs also cite, is also distinguishable.  There the jury

24  found that the relevant market was the market for primary and secondary acute care
    services in Lane County, Oregon, but did not find that the defendant hospital monopolized

25  that market.  Although the jury verdict finding attempted monopolization was reversed, the

26  jury verdict finding no monopolization was affirmed in *Cascade Health Solutions v.
    PeaceHealth*, 515 F.3d 883 (9th Cir. 2008).

27

28                                              – 21 –

1   definition is not generally required and outflow is not relevant.  However, here where

2   there is an attempt to use circumstantial evidence to establish monopoly power, outflow

3   of patients is relevant in defining the geographic number.

4          Moreover, a number of cases require that the market includes not only where

5   patients currently go but where patients allegedly driven by anticompetitive conduct

6   would go.  *See, e.g., Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 710 (4th Cir.

7   1991) (where court questioned plaintiffs' market definition where plaintiff "himself sent

8   patients outside" that alleged market); *U.S. v. Mercy Health Services*, 902 F. Supp. 968,

9   978 (N.D. Iowa 1995), *appeal dismissed as moot*, 107 F.3d 632 (8th Cir. 1997) ("The

10  analysis must focus . . . on where patients . . . could practicably go should [defendants]

11  become anticompetitive"); *Gordon v. Lewistown Hosp.*, 272 F. Supp. 393, 427, n. 31

12  (M.D. Pa. 2003) (where the court said that "[E]ven if patients fled Mifflin and Juniata

13  Counties for cataract surgery [due to anticompetitive conduct excluding the physician],

14  this would seem to suggest that patients viewed other suppliers of physician services as

15  viable alternatives to [plaintiffs]"), *aff'd*, 423 F.3d 184 (3d Cir. 2005).

16         Plaintiffs' expert, Dr. Frech, disagrees that this outflow is material, and Plaintiffs

17  and Dr. Frech cite a number of articles criticizing the use of the Elzinga-Hogarty test[15]

18  in determining a relevant geographic market in health care cases.  The Elzinga-Hogarty

19  test has been applied to patient flow information in a number of health care and other

20  cases.  *See California v. Sutter Health Sys.*, 84 F. Supp.2d 1057, 1072 (N.D. Cal. 2002);

21  *FTC v. Tenet Healthcare Corp.*, 17 F. Supp.2d 937 (E. D. Mo. 1998), *rev'd on other*

22

---

23         [15] *See* Frech Rebuttal at fn. 20-1 (Ex. 8).  The Elzinga-Hogarty test was devised by
24  Professors Kenneth G. Elzinga and Thomas F. Hogarty to help delineate geographic
    markets.  The test's underlying assumption is that if a geographic area does not represent
25  buyers' choices because a number of buyers go outside that area, the area should not be
26  considered a relevant geographic market because it is unlikely that a dominant firm in that
    area has or could exercise market power.

27

28                                              – 22 –

1    *grounds*, 186 F.3d 1045 (8th Cir. 1999); *FTC v. Freeman Hosp.*, 911 F. Supp. 1213,

2    *aff'd,* 69 F.3d 260, 264-65 (8th Cir. 1995); *United States v. Mercy Health Servs.*, 902 F.

3    Supp. at 978 (N.D. Iowa 1995), *vacated as moot*, 107 F.3d 632 (8th Cir. 1997).

4          Dr. Frech criticizes the use of the Elzinga-Hogarty test based on the "silent

5    majority" theory, which is that it is a false assumption that patients will travel to a

6    different hospital or doctor based on price considerations.  According to this theory, the

7    "silent majority" will not do so.  As Dr. Frech admits, the "silent majority" theory has

8    not been recognized by a court.[16]  Also, Dr. Frech does not attempt to verify or quantify

9    the size of the "silent majority."[17]  Here the patient flow data show that patients already

10   do travel to Phoenix for cardiology services.  Frech 2/10/07 Dep. at 197 (Ex. D).

11   Indeed, the very VVMC documents that Dr. Frech cites recognize the "Phoenix

12   hospitals" as competitors who draw patients from the Verde Valley.  VVMC 002670-71

13   (Ex. 137).  Thus, those hospitals in the Phoenix area should be included in the relevant

14   geographic market.

15         Dr. Frech also expresses a concern based on what has come to be known as the

16   "cellophane fallacy."  Frech Rebuttal at 9 (Ex. 8).  This comes from the decision in

17   *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956), where the

18   Supreme Court held that the relevant product market was all flexible packaging

19   materials, rather than cellophane.  The Supreme Court's analysis in this case has been

20   criticized because it considered the alternatives for cellophane after the defendant had

21   already raised its price to the monopoly level and so it should not be surprising that at

22   the monopoly price the defendant would face close substitutes in other flexible

23   _____

24         [16]  Plaintiffs correctly point out that the "silent majority" theory was noted by the
     FTC in its decision in *Evanston Northwestern Healthcare Corp.*, FTC Dkt. 9315, which is
25   discussed below with respect to direct evidence.
          [17]  Dr. Frech relies on the deposition testimony of Dr. Wilkinson and of Dr. DeMar
26   that their patients do not choose a hospital based on price. Frech Rebuttal at fn. 37-5 (Ex.8).

27

28                                              – 23 –

1    packaging materials and would not be able profitably to raise its price further.[18]  In

2    making this argument, however, Dr. Frech merely assumes that Defendants charged a

3    monopoly price (Frech Rebuttal at 123 (Ex.8)) based on VVMC's contribution margin

4    (which is discussed more fully below), which caused patients to switch to providers in

5    Phoenix.  However, Dr. Frech did not analyze Defendants' prices (Frech 2/10/07 Dep.

6    at 113 (Ex. D)) and, therefore, cannot state that they are above competitive levels,

7    which is critical to the "cellophane fallacy." Harris Rep. at 82 (Ex. 116).  Dr. Frech's

8    conclusion that "patients choose alternative facilities to VVMC outside the Cottonwood

9    Area at prevailing VVMC prices that they would not choose at competitive prices"

10   (Frech Rebuttal at 10 (Ex. 8)) is not only speculative.  It is also inconsistent with the

11   "silent majority" theory articulated by Plaintiffs that patients do not switch hospitals or

12   cardiologists based on price.  It also ignores quality considerations, which Dr. Frech

13   also has not analyzed.  In short, although Dr. Frech uses patient inflow and outflow as

14   one factor in determining the relevant geographic market, he criticizes the Elzinga

15   Hogarty test as being overbroad and inappropriate. Regardless of this criticism, Dr.

16   Frech has not satisfied the test even at the weakest acceptable level of 75% LIFO and

17   75% LOFI.  In particular, Dr. Frech's unwillingness to recognize that the geographic

18   market should include those hospitals where patients already go for Cardiology Facility

19   Services and Cardiology Professional Services renders his opinion insufficient as a

20   matter of law to support a jury finding that the geographic market was limited to the

21   Cottonwood Area as defined by the Plaintiffs.

22

23

24   _____

25         [18]  Some scholars refer to this analytical mistake as the "cellophane fallacy."  See George
      W. Stocking & Willard F. Mueller, *The Cellophane Case and New Competition*, 45 Am. Econ.

26   Rev. 29 (1955).  See also ABA Section of Antitrust Law, Market Power Handbook: Competition
      Law and Economic Foundations, 58-61 (2006).

27

28                                              – 24 –

Because the evidence does not support limiting the relevant geographic market to the Cottonwood Area and excluding Phoenix, no permissible inference of monopoly power can be drawn. *Morgenstern*, 29 F.3d at 1297. Where circumstantial evidence is used to establish monopoly power, this typically requires proof of a dominant share of the relevant market, entry barriers and the inability of the existing competitors to expand output. *Rebel Oil*, 51 F.3d at 1438-41. While there is no bright line for determining monopoly power, most courts require a market share in excess of 70%. *See generally, U.S. v. E. I. duPont de Nemours & Co.*, 351 U.S. at 391 (control of 75% of the relevant market would constitute monopoly power); *Eastman Kodak*, 504 U.S. at 481 (monopoly power can be inferred from an 80% market share); *Image Technical Servs*, 125 F.3d at 1206 ("courts generally require a 65% market share to establish a prima facie case of market.").

Relying on a geographic market definition that only includes the 15 zip codes of the Cottonwood Area, Dr. Frech does not provide an accurate estimate of either VVMC's market share in Cardiology Facility Services or VVH's market share in Cardiology Professional Services.[19] By including only 15 zip codes in the geographic market, Dr. Frech substantially overstates VVMC and VVH's market shares. Using the 15 zip codes that Dr. Frech identified, Dr. Frech states that VVMC enjoyed a market share in Professional Facility Services of 58% in 2005, and combined with the market shares of its sister hospital, NAH, enjoyed a market share of 63.8%. Frech Rep. at 25, Exs. 24-26 (Ex. 9). However, if the market were defined to account for 90% of the

---

[19] Using a supply based market share analysis, Dr. Frech claims that VVMC and VVH enjoy a market share at or near 100%. Frech Rep. at 25, Ex. 21-22 (Ex. 9). However, market definition focuses on demand substitution. *See* DOJ and FTC, Horizontal Merger Guidelines, ¶ 1.0.

1   patient outflow (rather than only 60%), VVMC's market share from 2001-2005 would

2   be estimated at 14.6%.  Harris Rep. at 85 (Ex. 116).

3        Similarly, for VVH for the 15 zip codes that Dr. Frech defines as the geographic

4   market, Dr. Frech claims that VVH enjoys a market share of 18.4 - 64.9% in 2001-05

5   (Frech Rep., Ex. 39-41(Ex. 9) whereas if the market were defined to account for 90% of

6   patient outflow (rather than 60%), VVH's market share from 2001-2005 would be

7   between 17.9 and 27%.  Harris Rep. at 54, Ex. 58-62 (Ex. 116).

8        With evidence supporting expansion of the market to include providers in

9   Phoenix and elsewhere to which patients in the market already turn, Plaintiffs offer no

10  evidence as to barriers to entry or expansion by the existing providers in this market,

11  thus also failing in this way to establish that the Defendants have monopoly power.  *See*

12  *Rebel Oil*, 51 F.3d at 1438.

13  **IV.    Direct Evidence of Monopoly Power**

14       Alternatively, Plaintiffs argue that direct evidence of market power is sufficient to

15  establish unlawful monopolization.  Plaintiffs cite a number of cases stating that direct

16  evidence of anticompetitive effects is sufficient to establish market or monopoly power.

17  *See e.g., FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Rebel Oil*, 51 F.3d

18  at 1434; *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir. 1988).  However,

19  few, if any courts, have relied solely on direct evidence to establish monopoly power.

20       As the court noted in *Rebel Oil*, 51 F.3d at 1434, a case involving allegations of

21  predatory pricing,

22
23              Market power may be demonstrated through either of two types
                of proof.  One type of proof is direct evidence of the injurious
24              exercise of market power.  If the plaintiff puts forth evidence of
                restricted output and supracompetitive prices, that is direct proof
25              of the injury to competition which a competitor with market
                power may inflict, and thus, of the actual exercise of market
26              power.  *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447,
                460-61, 90 L.Ed. 2d 445, 106 S. Ct. 2008 (1986).  The more

27
28                                    – 26 –

1
2
3
4

> common type of proof is circumstantial evidence pertaining to the structure of the market.  To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show the barriers to entry, (3) and show that existing competitors lack the capacity to increase their output in the short run.

5 However, the *Rebel* court itself only looked at circumstantial evidence and concluded

6 that the plaintiff had failed to establish a genuine issue of material fact with respect to

7 market power to support its claims of attempted monopolization under Section 2 of the

8 Sherman Act.[20]

9      Because direct proof is only rarely available and more rarely sufficient by itself

10 to establish market power, courts more typically examine market structure as

11 circumstantial evidence of monopoly power. 2A Areeda, Antitrust Law, p 531a at 156.[21]

12  In the few cases where direct evidence has been introduced, usually it has been found

13 to be inadequate.  *Geneva Pharms. Tech Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 500-01

14 (2d Cir. 2004)(where direct evidence of plaintiffs' high prices was inadequate to infer

15 monopoly power in that there was no analysis of costs or high price-cost margins);

16 *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 197 (3d Cir. 2007)(where court relied on

17 a mix of evidence, including supracompetitive prices, a dominant market share, and

18 entry barriers to reverse dismissal of the complaint); *Oltz*, 861 F.2d 1440 (where no

19 evidence was introduced to dispute the market and the court looked primarily at market

20 structure and confirmed the defendants' monopoly power by noting high prices).  *But*

21 _____

22     [20] The *Rebel Oil* court notes that a different standard is appropriate for establishing
23 sufficient market power to enforce supracompetitive oligopoly pricing for a price discrimination claim under the Robinson-Patman Act, which is not at issue here. *Rebel Oil*,
24 51 F.3d  at 1447-48.
    [21] "Direct evidence of anticompetitive effects is useful but normally not sufficient
25 in itself to demonstrate monopoly power in the absence of a defined antitrust market."
26 Department of Justice, "*Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act*," ("DOJ Report"), viii (2008).
27

28

*see Re/Max*, 173 F.3d at 1019-20 (where the court found that the defendants' ability to impose adverse-splits with its agents was sufficient direct evidence of monopoly power to defeat defendant's motion for summary judgment).

Plaintiffs cite the Federal Trade Commission's decision in *Evanston Northwestern Healthcare Corp ("ENH")*, FTC Dkt. 9315, where the FTC held that an economic analysis of defendants' post merger prices as well as defendants' business documents demonstrated that the defendant ENH was able to exercise market power after the merger to increase its prices to managed care companies. However, the direct evidence that was used in *ENH* is substantially different than that relied upon by the Plaintiffs and Dr. Frech in this case. In *ENH*, the FTC's economist presented extensive econometric evidence and used a three step process to predict the prices that ENH would have charged had the merger with Highland Park Hospital not occurred. Among other things, the economist considered changes in patient mix, customer mix and teaching intensity between ENH and the hospital control group. Following this, the economist applied a linear regression model to test whether these differences explained ENH's post-merger increase in prices. *Id.* at 26-35.[22] None of that was done here.

In this case Dr. Frech did not analyze the Defendants' prices as was done in *ENH*. Dr. Frech's report contains no analysis of any price data. Dr. Frech admitted that he had not done any comparison of VVH's prices with Cardiac Care's prices. Frech 2/10/07 Dep. at 113 (Ex. D). He also made no effort to calculate competitive prices for

_____

[22] Significantly, the FTC's economist admitted that her calculations of the average price increases did not by itself demonstrate post-merger market power because they did not control for other factors that might explain the increases. To address this, the FTC economist attempted to control for changes in cost, demand and regulation for ENH and the control group hospitals and then further considered patient mix measured by the complexity (and type) of the cases at each hospital, customer mix measured by the percentage of patients receiving Medicare or Medicaid assistance, and teaching intensity measure by the number of residents and interns per bed at each hospital.

Cardiology Facility Services or to determine whether VVMC charged higher than competitive prices, even though an analysis of direct effects would need to show that prices at VVMC and VVH were above competitive levels after accounting for all other factors. Frech 2/10/07 Dep. at 180-81; Frech Rebuttal at 141 (Ex. 8). Instead of analyzing prices, Plaintiffs rely on the high variable contribution margin for cardiology services provided by VVMC and Defendants' expert and review of profit margins for all hospital services for hospitals located in the Phoenix area based on data submitted to the State of Arizona to establish monopoly power for VVMC in Cardiology Facility Services and for VVH in Cardiology Professional Services. Frech 6/7/07 Dep. at 225-26 (Ex. S); Frech Rebuttal at 55-57; Ex. 55 (Ex. 8).[23] Even Dr. Frech admits that profit margins are not an accepted method to measure monopoly power. Frech 6/7/07 Dep. at 223 (Ex. S) (agreeing that "antitrust today does not rely heavily on profitability measures in making inferences about market power."). *See also, Blue Cross & Blue Shield of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) (Posner, J.) (stating that "[N]ot only do measured rates of return reflect accounting conventions more than they do real profits (or losses) as an economist would understand these terms, there is not even good economic theory that associates monopoly power with a high rate of return"); Baker & Bresnahan, *Empirical Methods of Identifying and Measuring Market Power*, 61 Antitrust L.J. 3, 5 (1991) ("high profits or margins might reflect efficiencies, such as low costs or superior product design, rather than market power").

However, the data as presented and analyzed by Dr. Frech are inadequate in a number of respects. First, they are accounting profits and not economic profits. Frech 6/7/07 Dep. at 220 (Ex. S). They cover only two years and do not account for

---

[23] There is no such study or analysis for VVH. Thus, there is no direct evidence of monopoly power for VVH.

differences attributable to differences in costs, mix of inpatient or outpatient services provided, or patient mix, as was done *in ENH*. *Id.* at 225. In addition, they are incomplete in that they exclude two hospitals within the relevant geographic market where the profit margins are also high. *Id.* at 226-229. Moreover, Dr. Frech admitted that he has not done any comparison of profits specifically for cardiology. Instead, Dr. Frech's rebuttal report only analyzes profits for hospital services in general. Frech 2/10/07 Dep. at 181 (Ex. D); Frech 6/7/07 Dep. at 224 (Ex. S); SOF, ¶¶ 16.[24]

In short, Dr. Frech's attempt to prove monopoly power by this profitability comparison is insufficient as a matter of law.

## V.   Attempted Monopolization

Because Plaintiffs have failed to demonstrate their proposed definition of the relevant geographic market or to establish through direct evidence monopoly power, Defendants argue that this is fatal to Plaintiffs' claim of attempted monopolization. To establish attempted monopolization, the Plaintiffs must prove: (1) the defendant has engaged in predatory or anticompetitive conduct; (2) with a specific intent to monopolize; and (3) thereby creating a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc., v. McQuillan,* 506 U.S. 447, 456 (1993). To determine whether there is a dangerous probability of achieving monopoly power, courts consider the relevant market and the defendant's ability to lessen or control competition in that market. A lesser degree of market power may be sufficient to establish attempted

---

[24] Even if Plaintiffs could show that the profits for cardiology "mirror" hospital profits, which do not appear to be part of this record, this does not rectify the other inadequacies noted above. As the DOJ noted in its recent report, "In short, direct evidence of a firm's profits, margins, or demand elasticities is not likely to provide an accurate or reliable alternative to the traditional approach of first defining the relevant and then examining market shares and entry conditions when trying to determine whether the firm possesses monopoly power." DOJ Rep. at 29 (2008).

– 30 –

monopolization where barriers to entry are established. *Rebel Oil*, 52 F.3d at 1438. While courts differ as to the percentage of the market that is required to find a dangerous probability of success, a market share of thirty percent is presumptively insufficient to establish a dangerous probability of success. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26 (1984). *See also Rebel Oil*, 51 F.3d at 1438 (44% market share where barriers to entry may be sufficient); *Twin City Sportservice v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975). Here the facts indicate that the relevant geographic market is not limited to the Cottonwood Area and includes Phoenix. There is also no proof of barriers to entry in this market. Thus, there is no permissible inference of market power sufficient to establish a dangerous probability of achieving monopoly power that can be drawn. Thus, Defendants' motion for summary judgment on Plaintiffs' claim for attempted monopolization is granted.

## VI.   Conspiracy to Monopolize

Defendants move for summary judgment on Plaintiffs' claims of attempted monopolization and conspiracy to monopolize (counts III, IV, VIII, IX), on the ground that Plaintiffs have failed to show that Defendants had a specific intent to monopolize, which is required for both offenses. To prove a conspiracy to monopolize, it is necessary to prove "a specific intent to monopolize and anticompetitive acts designed to effect that intent." *Freeman v. San Diego Association of Realtors*, 322 F.3d 1133, 1154 (9th Cir. 2003); *Hunt-Wesson Foods v. Ragu Foods*, 627 F.2d 919, 926-27 (9th Cir. 1980).[25] No particular level of market power need be alleged in a conspiracy claim

---

[25] This Court notes that the Ninth Circuit's standards for determining a conspiracy to monopolize under Section 2 of the Sherman Act appear to be less onerous than those required for determining a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and inconsistent with other courts that require a showing of a dangerous probability of success. *Fraser v. Major League Soccer*, 284 F.3d 47, 67-69 (1st Cir. 2002) (proof of a relevant market may be necessary to establish a conspiracy to monopolize claim);

– 31 –

1   where the specific intent to monopolize is otherwise apparent from the character of the

2   actions taken.  Where the action is ambiguous, the existence and extent of market power

3   may make the inference of specific intent from conduct more or less plausible.  *Id.*

4          A specific intent to monopolize the market may either be shown by direct

5   evidence of the defendant's state of mind or inferred from conduct where there is no

6   legitimate business justification but to destroy or damage competition.  Specific intent

7   to monopolize requires more than an intent to compete or even to exclude a particular

8   competitor.  It requires proof that the defendants intended to destroy all competition in

9   the market.  In addition, specific intent to monopolize cannot be inferred where the

10  conduct is supported by legitimate business justifications and is consistent with

11  permissible competition.  *Lantec, Inc. V. Novell, Inc.*, 306 F.3d 1003, 1029 (10th Cir.

12  2002).  As the Supreme Court stated in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S.

13  447 (1993), "The law directs itself not against conduct which is competitive, even

14  severely so, but against conduct which unfairly tends to destroy competition."

15         Plaintiffs claim that the Defendants repeatedly stated that their intent was to

16  block Plaintiffs from entering the Cardiology Facilities market and from expanding in

17  the Cardiology Professional Services market so that Defendants could charge higher

18  prices for cardiology services.  However, the record is ambiguous as to whether the

19  Defendants were acting with a legitimate business interest that was consistent with

20  competition or whether they had a specific intent to exclude all competitors from the

21  market.  Specifically, viewed most favorably to the plaintiffs, the record shows that:

22

23  _____

24  *Carter v. Variflex*, 101 F. Supp. 2d 1261, 1268 (C.D. Cal. 2000); *Stewart Glass & Mirror v.
    U.S.A. Glass, Inc.*, 940 F. Supp. 1026, 1038 (E.D. Tex. 1996).  *See also Spectrum Sports, Inc.
25  v. McQuillan*, 506 U.S. 447, 455-56 (1993) (where the Supreme Court expressly criticized
26  the Ninth Circuit's requirements for attempted monopolization, including a specific intent to
    monopolize).
27

28                                    – 32 –

1        (1) Dr. Patel had indicated that he wanted to open a facility that competed in part

2  with the hospital for Cardiology Facility Services.  VVMC was concerned about

3  referrals that would be lost if Dr. Patel or others developed a competing facility that

4  took business away from the hospital.  Ex. 29, ¶ 3.  At least Mr. O'Connor and Mr.

5  Sinek believed that VVMC could not work with Dr. Patel.  In response to Dr. Patel and

6  a situation involving the FMC, VVMC developed a policy to discourage physicians

7  from opening competing practices.  Ex. 83; Wilkinson Dep. at 22-29, 46-47, 183-200

8  (Ex. 14); Sinek Dep. 40-56 (Ex. 84).  Plaintiffs claim that this policy demonstrates a

9  specific intent by VVMC to monopolize Cardiology Facility services, but it did not

10  preclude physicians who opened competing facilities from obtaining privileges.  In

11  addition, the record shows that Drs. Patel and Ravi withdrew their privileges voluntarily

12  with no formal action by VVMC.  Exs. E, O.

13       The record also shows that in the Cardiology Facilities market VVMC faced

14  competition from Arizona Heart Hospital, Ex. 29, ¶ 5, and there is no evidence of

15  VVMC's intent to eliminate the Arizona Heart Hospital or other Phoenix hospitals as

16  competitors.  As far as the Cardiology Professional Services market is concerned,

17  VVMC is not a competitor in this market.

18       (2) Dr. Patel's privileges were being reviewed by VVMC, but the record also

19  shows that VVMC had a legitimate concern from a quality perspective with regard to

20  the number of cardiology procedures Dr. Patel performed.  Exs. 96, 97.

21       (3) There was hostility toward Dr. Heesch, and at least Dr. O'Connor and Mr.

22  Owens were insistent on revoking Dr. Heesch's temporary privileges and denying him

23  permanent privileges.  Dr. Dwyer refused to enter into a sharing agreement.  Ex. 14 at

24  86-108.  On the other hand, the record also shows that there were legitimate questions

25

26

27

28

– 33 –

raised as to Dr. Heesch's credentials and behavior, which were also of legitimate concern to VVMC. *Id.* at 108.

(4) Drs. Dwyer and Peek also were concerned with competition from Dr. Ravi, and so they invited him to join their practice, but he refused. They then became critical of his work. Ex. 29, ¶ 5. However, neither Dr. Dwyer nor Dr. Peek had the authority to revoke Dr. Ravi's privileges at VVMC, and Dr. Ravi withdrew his privileges before VVMC took any formal action against VVMC.

(5) In April 2006, after this suit was filed by Dr. Patel, Dr. Peek indicated that "we will put Dr. Patel out of business" and "run him into the ground with legal fees". Ex. 123 ¶ 5. However, it was Dr. Patel, not Dr. Peek, who initiated this litigation.

Although there was much concern and hostility expressed by the Defendants towards Dr. Heesch, Dr. Patel, and Cardiac Care, Defendants' actions do not evidence an intent to monopolize Cardiology Facilities and Cardiology Professional Services in an area extending beyond Cottonwood to Phoenix. Moreover, to the extent there is any ambiguity as to whether they merely reflect vigorous competition or a specific intent to monopolize the Cardiology Professional Services market and the Cardiology Facilities market, Plaintiffs' lack of market power makes an inference of an intent to monopolize even less plausible. Given that the relevant geographic market is not limited to the Cottonwood Area and includes Phoenix, the Plaintiffs' market power is insufficient to establish a specific attempt to monopolize either the Professional Cardiology Services market or the Cardiology Facilities market alleged by Plaintiffs. Thus, Defendants' motion for summary judgment on Plaintiffs' claim of conspiracy to monopolize is granted.

**VII.   Tying**

– 34 –

1    Plaintiffs allege that Defendants have forced payers and patients to purchase

2    Cardiology Professional Services from VVH (the tied product) in order to use VVMC's

3    Cardiology Facilities Services and Inpatient Services (the tying product).  CAC ¶ 116.

4    Defendants moved for summary judgment on the ground, among others, that VVMC,

5    the owner of the tying product, does not have an economic interest in the tied product,

6    VVH's services.  Defendants are correct that typically tying claims require the seller

7    forcing the tie to have an economic interest in both the tied product and the tying

8    product.  A tie may be found where the same party sells both the tying and the tied

9    products or where the seller of the tying product requires that the tied product be

10   purchased from a third party in which the seller has an economic interest in the sale of

11   the tied product.  *County of Toulemne v. Sonoma Community Hospital*, 236 F.3d 1148,

12   1158 (9th Cir. 2001)(no tie because the hospital did not receive any portion of the

13   physician's fee); *Beard v. Parkview Hosp.*, 912 F.2d 138, 143 (6th Cir. 1990);

14   *Rockingham Radiologists, Ltd.*, 820 F.2d 98, 104 (4th Cir. 1987).  Neither is the

15   situation here.

16       Plaintiffs claim that because Cardiology Facilities and Cardiology Professional

17   Services are complementary, that is sufficient to establish that VVMC has an economic

18   interest in VVH.  However, to the extent that VVMC's economic interest in its facility

19   is complementary to professional cardiology services provided at VVMC, there is no

20   indication that VVMC's interest is or should be tied or limited to one physician group.

21   Thus, Defendants' motion for summary judgment on Plaintiffs' tying claims is granted.

22   **VIII.  Antitrust Injury**

23       By granting the Defendants' motion for summary judgment on Plaintiffs'

24   antitrust claims, it is not necessary that this Court address the question of standing. *See*

25   *e.g., Levine v Central Florida Medical Affiliates*, 72 F.3d 1538, 1545 (11th Cir. 1996)

26

27                                         – 35 –

28

1  (Where there is no threat to competition and therefore no antitrust violation, there is no

2  standing to bring suit); *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1109 n.2 (5th

3  Cir. 1979). Therefore, it is appropriate to consider in the alternative whether the

4  Plaintiffs have standing to bring this antitrust action.

5         Standing for antitrust violations is governed by section 4 of the Clayton Act

6  which provides that "[a]ny person who shall be injured in his business or property by

7  reason of anything forbidden in the antitrust laws may sue therefore . . . ." 15 U.S.C. §

8  15(a). *Associated General Contractors v. California State Council of Carpenters*, 459

9  U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983) makes clear that the standing question

10 requires an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendants,

11 and the relationship between them. Antitrust standing goes beyond showing "injury in

12 fact" and includes a determination whether the plaintiff is a proper party to bring a

13 private antitrust action. Whether the Plaintiffs in this case are proper parties depends on

14 the factors articulated in *Associated General*: (1) The causal connection between the

15 alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3)

16 Whether the injury was of a type that Congress sought to redress with the antitrust laws;

17 (4) The directness between the injury and the market restraint; (5) The speculative

18 nature of the damages; and (6) The risk of duplicate recoveries or complex damage

19 apportionment. The court is to weigh these factors in determining whether to enforce a

20 plaintiff's antitrust claim.

21         It is not sufficient to show some causal link between "the mere presence of a

22 violator in the market" and harm caused to a plaintiff. More must be shown. As the

23 landmark decision of *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 50 L.

24 Ed. 2d 701, 97 S. Ct. 690 (1977) makes clear, a mere causal connection between an

25 antitrust violation and harm to a plaintiff cannot be the basis for compensation unless

26

27

28                                          – 36 –

1  the injury is directly related to the harm the antitrust laws were designed to protect.

2  Antitrust standing is a question of law. *American Ad Management, Inc. v. General*

3  *Telephone Co.*, 90 F.3d 1051, 1054 (9th Cir. 1999); *Bhan v. NME Hospitals, Inc.*, 772

4  F.2d 1467 (9th Cir. 1985).

5      In applying these requirements, courts have come to focus on two separate

6  issues. The first is the question of causation that also arises in the tort context. That is

7  the question whether the defendant actually caused the alleged injury. *Associated*

8  *General Contractors*, 459 U.S. at 532-33. Recognizing that common law principles

9  governing tort claims are also applicable in the antitrust context, the Court has required

10  a showing of proximate cause between the defendant's antitrust violation and the

11  plaintiff's injury. *Id.* In this case the Plaintiffs claim that Dr. Patel, Dr. Ravi, Dr. Heesch

12  and Cardiac Care were injured as a result of Defendants' conduct. Their argument is

13  that Plaintiffs Dr. Patel and Cardiac Care wanted to expand their cardiology practice to

14  include interventional cardiology and that this expansion would compete in part with

15  the cardiology services provided by Drs. Peet and Dwyer, who had privileges at

16  VVMC, and with VVMC to the extent that it provided the facility for the cardiologists

17  to provide these services.  To do this Plaintiffs needed to recruit and retain

18  interventional cardiologists as employees or partners in Cardiac Care and those

19  cardiologists needed to have privileges to perform interventional cardiology at

20  VVMC. When VVMC denied  Dr. Heesch privileges at VVMC and threatened to

21  review Dr. Ravi's and Dr. Patel's privileges at VVMC, Plaintiffs' plan was thwarted,

22  thus causing them injury for which they claim the Defendants are liable.

23      Defendants in turn argue that Defendants did not cause any injury

24  to Plaintiffs. First, they argue that they are not the cause of Dr. Patel and Dr. Ravi losing

25  their privileges at VVMC because both of them voluntarily resigned their

26

27

28

1    privileges from VVMC without revocation of privileges by VVMC. VVMC 011225

2    (Ex. E); Ravi Dep. at 78 (Ex. M); NP 005148 (Ex. V).  Therefore, Defendants argue, it

3    cannot be said that Dr. Patel or Dr. Ravi's withdrawal from VVMC was proximately

4    caused by Defendants.

5         Physicians who have been denied privileges have routinely sued on antitrust

6    grounds. The standing of physicians to sue varies depending on the circumstances

7    because the Supreme Court has injected into the Section 4 standing requirement that the

8    injury be proximately caused by the illegal conduct. The courts have consistently denied

9    standing to bring suit where the plaintiffs have voluntarily withdrawn from the

10   market. *See e.g.*, *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1375-76 (8th Cir.

11   1983); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229 (6th Cir. 1981); *A.D.M. Corp. v.*

12   *Sigma Instruments, Inc., 628 F.2d 753 (*1st Cir. 1980*)*.  Thus, a physician who has not

13   been denied privileges but has voluntarily withdrawn his or her privileges cannot then

14   claim that he or she was excluded as a result of hospital action as the hospital may or

15   may not have ultimately denied or revoked the physician's privileges.

16        Next Defendants argue that Defendants did not cause Cardiac Care to leave the

17   market as Cardiac Care continues to be a thriving competitor in the market. However,

18   this argument ignores the essence of Plaintiffs' claim which is that Plaintiffs are

19   precluded from expanding their practice and their facilities to include a broader range of

20   cardiology services.  More to the point, Defendants also argue that they did not cause

21   Cardiac Care to abandon its expansion plans as it is "speculative at best" that Dr. Patel

22   and Cardiac Care could have established a cardiac cath unit. They claim that an

23   outpatient unit of the sort contemplated by Dr. Patel could not perform both diagnostic

24   catheterization and interventional procedures. *Id.* at 45-46 (Ex. F).  They also note that

25   the catheterization unit was a passing idea of Dr. Patel's as more recently he was

26

27                                          – 38 –

28

1    investing in an advanced form of CT scanner instead of a catheterization unit. Patel

2    2/7/07 Dep. at 96-97 (Ex. F). While this remains in dispute, Defendants do not dispute

3    the fact that the VVMC's denial of privileges for Dr. Heesch precluded Dr. Heesch

4    from practicing at VVMC, which in turn eliminated any income to Dr. Heesch or

5    Cardiac Care for the services that Dr. Heesch would have performed at VVMC had Dr.

6    Heesch's privileges not been denied. Thus, Defendants could be found to have caused

7    injury to both Cardiac Care and Dr. Heesch.

8          The second issue that arises in the antitrust context is whether the defendants

9    caused the plaintiff what has come to be known as "antitrust injury", that is "injury of

10   the type the antitrust laws were intended to prevent and that flows from that which

11   makes the defendants' acts unlawful." *Brunswick,* 429 U.S. 477. In this context

12   Defendants make a number of arguments.  First, Defendants claim that Defendants'

13   actions did not cause any "competition reducing" activity, as required under *Brunswick*

14   and *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344 (1991), because, by

15   VVMC denying Dr. Heesch privileges (and by threatening to deny Dr. Ravi privileges),

16   VVMC was not reducing cardiology services that otherwise would have benefited

17   VVMC.  However, Plaintiffs' position is that, as a result of Defendants' conduct, there

18   was at least one fewer interventional cardiologist in the market for Professional

19   Cardiology Services and one fewer competitor in the market for Cardiology Facility

20   Services.  That VVMC's own output in Cardiology Facility Services may have

21   increased for certain services performed at VVMC as a result of the expansion of

22   Cardiac Care does not mean that competition may not have been reduced for other

23   services at VVMC or for Professional Cardiology Services.

24         Next Defendants argue that Plaintiffs have not established an actual adverse

25   effect on competition as a whole in the relevant market.  They argue that it is injury to

26

27                                        – 39 –

28

1  the market or competition in general, not merely injury to individuals or individual

2  firms, that is significant. *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 811 (9th Cir.

3  1988). As the court noted in *Marshall v. Planz,* 13 F. Supp.2d  1231 (M.D. Ala. 1998),

4  in antitrust actions brought by physicians based on credentialing decisions of hospitals,

5  courts are often confronted with the question whether a plaintiff who was injured,

6  suffered the type of injury that is compensable under the antitrust laws. As the Supreme

7  Court has stated, "the antitrust laws . . . were enacted for the protection of competition,

8  not competitors." *Brunswick,* 429 U.S. at 488, *quoting Brown Shoe Co. v. United States,*

9  370 U.S. at 320; *Fox v. Good Samaritan Hospital,* 2007 U.S. Dist. Lexis 77314 (N.D.

10  Cal. 2007).  Therefore, Plaintiffs must demonstrate injury to competition, not just

11  Plaintiffs.

12         Defendants argue that the elimination or exclusion of one competitor, like Dr.

13  Heesch from the Cardiology Professional Services market or Cardiac Care from the

14  Cardiology Facility Services market, could not have an adverse effect on

15  competition.  Injury to an individual doctor without some proof of harm to competition

16  in the marketplace does not establish the requisite antitrust injury. In the area of staff

17  privileges the exclusion  of a single physician from a market in which there are many

18  competing physicians does not show the adverse effect on competition that is

19  required. *See e.g., Oksanen,* 945 F.2d at 709; *Austin v. McNamara,* 979 F.2d 728 & n.

20  11 (9th Cir. 1992) (nowhere in *Pinhas* did we suggest that injury to Pinhas alone would

21  constitute injury to competition).  *See also McGlinchy v. Shell Chemical Company*, 845

22  F.2d at 811 (9th Cir. 1988). As the Supreme Court indicated in *Brown Shoe Co. v.*

23  *United States*, 370 U.S. at 320 (1962), the elimination of a single competitor, without

24  more, does not prove anticompetitive effect. *Id.* at 812. *See also Kaplan v. Burroughs*

25

26

27

28

– 40 –

1    *Corp.*, 611 F.2d 286, 291 (9th Cir. 1979); *Rebel Oil*, 51 F.3d at 1433 ("But reduction of

2    competition does not invoke the Sherman Act until it harms consumer welfare.").

3          Perhaps more importantly, Plaintiffs have not established that Cardiac Care could

4    not add another interventional cardiologist. Plaintiffs point to the VVMC's treatment of

5    Dr. Ravi as evidence that VVMC would not grant any other interventional cardiologist

6    associated with Cardiac Care privileges at VVMC, but this is inconclusive as Dr. Ravi

7    voluntarily withdrew his privileges. Plaintiffs also point to the Economic Conflict of

8    Interest Policy adopted by VVMC (VVMC 029555) (Ex. 100), but this policy stops

9    short of precluding privileges for a physician that owns a facility that competes with the

10   hospital. Moreover, despite the exclusion of Dr. Heesch, Dr. Patel admitted that he

11   added another cardiologist, Dr. Sharma, to Cardiac Care.  Patel 7/24/06 Dep. at 18 (Ex.

12   A).  Dr. Patel also admitted that he has not encouraged or required Dr. Sharma to apply

13   for privileges at VVMC, and there is no evidence that Dr. Sharma's request for

14   privileges would be denied.  Patel 2/07/07 Dep. at 61-62 (Ex. F).  Plaintiffs' reliance on

15   *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404 (9th Cir. 1991) is misplaced in that *Bhan*

16   established antitrust injury by showing the exclusion of entire class of nurse anesthetist

17   competitors, which is not the issue here.

18         Also, as Defendants point out, Plaintiffs have not shown that the exclusion of Dr.

19   Heesch in any way affected the price or quality of Cardiology Professional Services in

20   the relevant market. Plaintiffs' expert, Dr. Frech, admitted that he had not done any

21   comparison of VVH's prices with Cardiac Care's prices nor had he done any

22   comparison of VVH's quality with Cardiac Care's quality. Frech 2/10/07 Dep. at 113-

23   14 (Ex. D).  Thus, Plaintiffs have not shown an adverse effect on competition, which is

24   necessary to establish antitrust injury and standing to bring this antitrust suit.[26]

25   _____

26         [26] A further issue is whether Dr. Heesch, an employee of Cardiac Care, is the proper
     party to bring suit. As a competitor attempting to expand in the Cardiology Facility

27

28                                            – 41 –

IX.    **Immunity Under the HCQIA**

Defendants also claim that under the Health Care Quality Improvement Act ("HCQIA"), they are immune from all state and federal damage claims, including federal antitrust claims, relating to the denial of Dr. Heesch's staff privileges. Defendants' Memorandum, 22.  In response, Plaintiffs essentially cite three reasons why defendants are not entitled to HCQIA immunity:

(1)    Defendants knowingly provided false information and documents to a peer review committee.

(2)    Defendants failed to make a reasonable effort to obtain the facts.

(3)    Defendants employed procedures that were unfair, including simply failing to give Dr. Heesch any opportunity to respond to charges and findings.

Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Plaintiffs' Response"), 20.  However, Defendants claim that:

(1)    The peer review committee did hear from Dr. Heesch, in a Fair Hearing encompassing approximately 90 hours of testimony, in which Dr. Heesch himself testified for nine hours,

(2)    The "secret investigation" of which Dr. Heesch complained of was a search of public court filings which was addressed at the Fair Hearing,

---

Services market, Cardiac Care is a proper party to bring suit against the Defendants. As far as whether Dr Heesch has standing to sue, the key question is the arrangement that Dr. Heesch had with Cardiac Care -- whether professional fees are paid directly to Dr. Heesch or indirectly to Cardiac Care or whether Dr. Heesch's compensation was dependent upon the professional fees he received. Dr. Heesch was an employee of Cardiac Care.  Heesch Dep. at 97 (Ex. X); Patel 7/24/06 Dep. at 7 (Ex. A). Generally, employees and shareholders lack standing to bring suit, if the corporation is injured by an antitrust conspiracy. *Stein v. United Artists Corp.*, 91 F.2d 885, 896 (9th Cir. 1982); *Ostroffe v. H.S. Crocker Co.*, 670 F.2d 1378 (9th Cir. 1982). However, we need not  resolve the issue here.

– 42 –

1

2       (3)     The settlement offer Dr. Heesch attacked was a Consent Agreement offered by the VVMC Medical Executive Committee ("MEC") which "closely tracked" the recommendations of the Fair Hearing, and

3

4

5       (4)     VVMC brought no "charges" against Dr. Heesch at the Arizona Medical Board, but rather, complied with statutory reporting requirements, as is required to do when a physician loses clinical privileges.

6

7    Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary

8    Judgment, 11 ("Defendants' Reply").

9         The HCQIA was passed in 1986, among other things, to reaffirm the importance

10   of peer review of physicians and "to provide incentive and protection for physicians

11   engaging in effective professional review." 42 U.S.C. § 11101.  As the court noted in

12   *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1337 (11th Cir. 1994),

13   Congress passed the HCQIA to "reinforce the pre-existing reluctance of courts to

14   substitute their judgment on the merits for that of health care professionals and of the

15   governing bodies of hospitals."

16        Under the HCQIA, a defendant professional review body is immune from

17   monetary damages arising out of a professional review action under the HCQIA as long

18   as the review action meets four specific conditions.  Under the HCQIA, a professional

19   review body, all members and staff of the body, and all individuals who participate in or

20   assist the body are not liable in damages for any action arising out of a professional

21   review action. 42 U.S.C. § 11111(a)(1) (2000).  For immunity to apply, the review

22   action must be taken:

23

24       (1)     In the reasonable belief that the action was in the furtherance of quality health care;

25       (2)     After a reasonable effort to obtain the facts of the matter;

26       (3)     After adequate notice and hearing procedures are afforded to

27

28

1        the physician involved or after such other procedures as are
     fair to the physician under the circumstances; and

2

3       (4)     In the reasonable belief that the action was warranted by the
     facts known after such reasonable effort to obtain facts and
     after meeting the requirement of 42 U.S.C. § 11112(a) (3).

4

5   42 U.S.C. § 11112(a)(1)-(4).  *Austin v. McNamara*, 979 F.2d 728, 733 (9th Cir. 1992).

6   When a court considers whether a health care entity is immune from damages for a

7   given professional review action, it considers whether that action, considered as a

8   whole, and including all the professional review activities relating to it, meets the

9   standards set forth in 42 U.S.C. § 11112(a).  *Singh v. Blue Cross/Blue Shield*, 308 F.3d

10  25, 37 (1st Cir. 2002).

11       Under the HCQIA, there is a rebuttable presumption, in favor of the party

12  claiming the immunity, that the four prerequisites of 42 U.S.C. § 11112(a) have been

13  met.  A professional review action shall be presumed to have met the standards

14  necessary for the protection set out in 42 U.S.C. § 11111(a) unless the presumption is

15  rebutted by a preponderance of the evidence.  *Austin*, 979 F.2d at 734.  Thus, the party

16  challenging the review action bears the burden to show, by a preponderance of the

17  evidence, that at least one of the four conditions listed in 42 U.S.C. § 11112(a) has not

18  been met.  If the aggrieved party does not satisfy this burden, then a review action

19  worthy of HCQIA protection will be deemed to have occurred.  As the court stated in

20  *Gordon v. Lewistown Hospital*, 423 F.3d 184, 202 (3d Cir. 2005), "The HCQIA places a

21  high burden on physicians to demonstrate that a professional review action should not

22  be afforded immunity."

23       Under the HCQIA, "immunity is a question of law for the court to decide and

24  may be resolved whenever the record in a particular case becomes sufficiently

25  developed."  *Bryan*, 33 F.3d at 1332.  Congress intended the HCQIA "to permit

26  defendants in suits arising out of peer review disciplinary decisions to file motions to

27

28       – 44 –

1   resolve the issues concerning immunity from monetary liability as early as possible in

2   the litigation process." *Bryan*, 33 F.3d at 1332; *Austin,*, 979 F.2d at 734 n.5.  In

3   particular, at the time of its passage the House Committee explained, "These provisions

4   allow defendants to file motions to resolve the issue of immunity in as expeditious a

5   manner as possible." *See* H.R. Rep. No. 903, 99th Cong., 2d Sess. 12 *reprinted in* 1986

6   Code Cong. & Admin. News 6394.

7        A court should consider the issue of HCQIA immunity from damages at the

8   summary judgment stage.  The standard on a motion for summary judgment is whether

9   a reasonable trier of fact, viewing the facts in the light most favorable to the plaintiffs,

10  could conclude that the defendants failed objectively to meet the HCQIA standards.

11  *Austin*, 979 F.2d at 733-34; *Singh*, 308 F.3d at 34-36 (1st Cir. 2002).  As the court in

12  *Bryan*, 33 F.3d at 1333, notes, "In a sense the presumption language in the HCQIA

13  means that the plaintiff bears the burden of providing the peer review process was *not*

14  reasonable."  If the court determines that the defendant is not entitled to such protection,

15  then "the merits of the case should be submitted to the jury without reference to the

16  immunity issue." *Bryan*, 33 F.3d at 1333.  Furthermore, "if there is a factual question

17  on which the existence of the immunity is dependent, then an award of summary

18  judgment on the basis of HCQIA immunity must be postponed until, or after, trial."

19  *Crosby v. Hospital Auth.*, 873 F. Supp. 1568, 1581 (M.D. Ga. 1995).  "The substantive

20  standards under the HCQIA remain the same regardless of the point at which the

21  immunity determination occurs." *Bryan*, 33 F.3d at 1332.  If there are disputed issues

22  of fact concerning HCQIA immunity, the court may ask the jury to resolve the factual

23  questions by responding to special interrogatories. *Bryan*, 33 F.3d at 1333.  As the

24  court noted in *Singh*, 308 F.3d at 36:

25          Given the objective standards set forth in the statute,
           reasonableness determinations under the HCQIA may often
26          become legal determinations appropriate for resolution by the

27

28                                    – 45 –

1    judge at summary judgment.  If there are no genuine disputes
2    over material historical facts, and if the evidence of reasonableness within the meaning of the HCQIA is so one-sided that no reasonable jury could find that the defendant health
3    care entity failed to meet the HCQIA standards, the entry of summary judgment does no violence to the plaintiff's right to a
4    jury trial.

5        **(1)**    **The professional review action was taken in the reasonable belief that**
6                    **the action was in furtherance of quality health care.**

7        The first prong of the HCQIA immunity test is met if the reviewers, with the

8    information available to them at the time of the professional review action, would

9    reasonably have concluded that their action was taken to further quality health care,

10   which has been interpreted to include restricting incompetent behavior and protecting

11   patients.  *Bryan*, 33 F.3d at 1334-35 (11th Cir. 1994).  Significantly, "[t]he HCQIA was

12   designed to prevent patient harm, not to assure an adequate response after it occurred."

13   *Singh*, 308 F.3d at 38 (citing 42 U.S.C. § 11101(1) (describing Congressional finding

14   that peer review was necessary in order to keep "incompetent physicians" from harming

15   patients;  *See also Imperial v. Suburban Hosp. Ass'n, Inc.*, 37 F.3d 1026, 1030 (4th

16   Cir. 1994) ("[T]he Act does not require that the professional review result in an actual

17   improvement of the quality of health care.  Rather, the defendants' action is immune if

18   the process was undertaken in the *reasonable belief* that quality health care was being

19   furthered.").

20       This test has been satisfied in cases where the plaintiff physician is found to have

21   engaged in unprofessional or disruptive behavior, often involving complaints of abusive

22   treatment of nurses, technicians and even other physicians.  Courts have held that a

23   physician's misconduct does not have to relate solely to his or her medical performance,

24   but can pertain to interaction with hospital personnel and the failure to follow hospital

25   policies.  *Hilton v. Children's Hosp. San Diego*, 2004 U.S. App. LEXIS 15454 *4-5

26   (9th Cir. July 29, 2004); *Bryan*, 33 F.3d at 1335  (where physician's unprofessional and

27

28                                         – 46 –

1    disruptive conduct was sufficient to demonstrate an effect on quality of care). *See also*

2    *Taylor v. Kennestone Hosp., Inc.*, 266 Ga. App. 14, 15 (Ga. Ct. App. 2004)(a

3    physician's misconduct does not have to relate to his or her medical performance, but

4    can pertain to interaction with hospital personnel and the failure to follow hospital

5    policies). In *Austin* and *Bryan*, the court found that the plaintiff physician's assertions

6    of the hospital's hostility against him did not support the physician's position that the

7    hospital was not entitled to the HCQIA's protections because they were irrelevant to the

8    reasonableness standards of § 11112(a). The real issue, the court stated, was the

9    sufficiency of the basis for the hospital's actions. *Austin*, 979 F.2d at 735; *Bryan*, 33

10   F.3d at 1335. The legislative history of § 11112(a) indicates that its reasonableness

11   requirements were intended to create an objective standard, rather than a subjective

12   good faith standard. *Austin*, 979 F.2d at 734. *See also Poliner v. Texas Health Systems*,

13   2008 U.S. App. LEXIS 15580 (5th Cir. 2008).

14        In this case, Defendants argue that there was a reasonable belief that the action

15   was in furtherance of health care as the VVMC MEC initially sought on December 18,

16   2001 to deny Dr. Heesch privileges based on charges of (1) violations of bylaws,

17   including allegations that he performed medical services  outside the approved scope of

18   his privileges; (2) failure to discharge medical staff responsibilities by refusing to

19   participate in hospital quality processes; (3) lack of qualifications to provide best

20   possible care, specifically failure to orient to equipment, staff and transfer protocols of

21   the Cardiac Cath Lab; and (4) failure to cooperate with hospital personnel (disruptive

22   behavior). VVMC 00245 (Ex. I). These charges were amended to include (1) Dr.

23   Heesch's failure to disclose that his privileges had been limited, restricted or curtailed at

24   one or more of the facilities in which he had previously practiced; (2) his clinical

25   competence had been questioned; (3) there existed a pending suit involving his

26

27

28                                  – 47 –

professional practice; and (4) his lack of education, training and experience to perform the privileges which he sought.  The charges of disruptive conduct were also expanded to include breach of patient confidentiality and efforts to influence the hearing process through oral and written public statements about the defendant hospital's administration.  ADM 00235 (Ex. 53); CAC, ¶ 58 .  These latter charges of disruptive conduct were later dropped against Dr. Heesch.  CAC, ¶60.

In a hearing of approximately 90 hours of testimony (SOF, ¶30); (Defendants' Reply, Ex. C), the Ad Hoc Hearing Committee on August 18, 2002 upheld the charges that Dr. Heesch (1) violated the bylaws by performing services outside the scope of his privileges, (2) engaged in disruptive behavior, and (3) failed to disclose in his application[27] to Verde Valley Medical Center (VVMC 00074 (Ex. 15)) that "his ability to practice at the University of Pittsburgh Medical Center and the VA Hospital was restricted".  PAT 00001 (Ex. J).  On December 3, 2002, the Board of Directors ultimately based its findings on (1) the failure to disclose pertinent information in his application and (2) Dr. Heesch's performing procedures for which he did not have privileges.  (Ex. K)  The charge of disruptive conduct was not relied upon because of "conflicting testimony."

Plaintiffs' reliance on *Clark v. Columbia/HCA Info. Servs.,*117 Nev. 468, 476-78 (Nev. 2001) is misplaced in that the record in that case showed that the reason for the psychiatrist's dismissal was his apparently good faith reporting of perceived improper hospital conduct to the appropriate outside agencies.  Under these circumstances the court concluded that the psychiatrist had overcome the presumption of the defendants'

---

[27]   The specific questions in his applications were:  "19.  Have you ever been disciplined, restricted, suspended, or dropped involuntarily or voluntarily from a hospital or any institution's medical staff?"  Dr. Heesch checked "No."  "32.  MEMBERSHIP ON OTHER HOSPITAL STAFFS."  Dr. Heesch provided a list but that list did not include the VA Hospital.  VVMC 0074-0079 (Ex. 15).

– 48 –

immunity by demonstrating by a preponderance of the evidence that the revocation of his staff privileges was not with the reasonable belief that it was in furtherance of quality health care by *the plaintiff physician*.  Here the focus is on Dr. Heesch and whether his conduct was unprofessional as a result of his medical performance, his interaction with hospital personnel and his failure to follow hospital policy.  As noted above, Plaintiffs' argument that the action against Dr. Heesch was motivated by anticompetitive concerns does not overcome HCQIA immunity if the requirements of the HCQIA are satisfied.

Nevertheless, Plaintiffs strenuously argue that the proceeding against Dr. Heesch was contrived by Dr. Dwyer and others in VVMC from the beginning and that the entire proceeding against Dr. Heesch was tainted as a result even though it involved two separate appeals.  In particular, Plaintiffs focus on a meeting of the cath lab staff with Dr. Heesch on December 10, 2001, in which Dr. Heesch was alleged to be "disruptive," and VVMC's alleged attempt to coerce a nurse into signing a false statement against Dr. Heesch (Ex. 30), which is apparently disputed. (Ex. 50 at 32-40).  However, the concerns about Dr. Heesch began earlier than that on December 6, 2001 (and then again on December 11, 2001) with respect to his performance of procedures beyond his privileges.  VVMC 000669 (Ex. 43); Ex. 50 at 15, 17.  In short, plaintiffs' argument that it was all contrived and that there was no basis for any action taken against Dr. Heesch is not supported by the record.  In addition, the record shows that each of the charges against Dr. Heesch was considered first by an Ad Hoc Committee and then by the VVMC Board, as discussed below.

(2)     **The professional review action was taken after reasonable effort to obtain the facts of the matter.**

– 49 –

1

2    The second prong requires the defendants to make a reasonable effort to obtain

3    the facts of the matter. In most cases this prong is satisfied if the review panel's decision

4    is supported by the factual record developed during the hearing and the plaintiff has an

5    opportunity to present his case before the panel. *Bryan*, 33 F.3d at 1335 (decision was

6    based on record developed during the hearing and after Bryan had opportunity to make

7    a presentation). In this case the hearing was extensive, and Dr. Heesch was given the

8    opportunity to make a presentation, which he did. At the end of the hearing Dr. Heesch

9    testified that he believed he had been given a fair hearing.

10       Several issues were raised by Plaintiffs to dispute the presumption that there was

11   a reasonable effort by Defendants to obtain the facts. One issue is that Defendants

12   "cooked the books" by deliberately coercing and knowingly using false statements

13   against Dr. Heesch, as indicated in the deposition testimony of a nurse who attended the

14   staff meeting in which Dr. Heesch was later criticized as being disruptive. (Ex. 30)

15   However, the VVMC Board of Directors recognized that there was conflicting

16   testimony on the question of Dr. Heesch's alleged disruptive conduct (Ex. 50) and did

17   not ultimately find that as a basis for denying his privileges. (Ex. K).

18       A second issue raised by the Plaintiffs was that the Defendant hospital staff did

19   not share with Dr. Heesch the results of its investigation of Dr. Heesch's privileges at

20   the University of Pittsburgh Medical Center and the Veterans Affairs Hospital in

21   Pittsburgh, which was one of the bases for his denial of privileges by the Board. It

22   appears from the record that there were no reportable restrictions placed on Dr.

23   Heesch's privileges, as none were shown in the National Practitioner Data Base. The

24   record shows that Mr. Raup, counsel for the VVMC, wrote a letter to the Chief of Staff

25   at the VA Hospital in Pittsburgh and received a reply on May 15, 2002 indicating that

26   Dr. Heesch voluntarily left his position on May 24, 1996 and there were no adverse

27

28                                        – 50 –

1   actions against Dr. Heesch while he was there that would necessitate reporting Dr.

2   Heesch to the National Practitioner Data Bank.  Heesch 00401 (Ex. 64).  There is also a

3   letter to Dr. Heesch from Medical College of Georgia Health System indicating that

4   after investigation none of the events while Dr. Heesch was at University of Pittsburgh

5   "appear to have required disclosure for credentialing purposes."  LECG 02274 (Ex. 67).

6


[Redacted by order of the Court.]

[Redacted by order of the Court.]

14    Plaintiffs cite *Brown v. Presbyterian Healthcare Services*, 101 F.3d 1324, 1334

15   (10th Cir. 1996), for the rule that, "HCQIA immunity does not apply when a reasonable

16   jury could find a false report by the hospital or doctors acting in concert with the

17   hospital and they knew the report was false."  However, here the Ad Hoc Committee

18   determined that the information as to Dr. Heesch's experience at the University of

19   Pittsburgh and the VA Hospital was inconsistent and that it would rely on documents

20   filed in litigation brought by Dr. Heesch.  Under these circumstances, no reasonable

21   jury could conclude that the Defendants failed to make a "reasonable effort to obtain the

22   facts."

23    Plaintiffs also argue that there was no basis for the claim that Dr. Heesch violated

24   the bylaws when he performed procedures without appropriate privileges.  However, the

25   Ad Hoc Committee also considered this and found:

26

27

28                                   – 52 –

1
2
3
4
5
6
7

> With respect to the first noticed issue, whether Dr. Heesch violated the bylaws by participating in TEE and pacemaker procedures without having first obtained appropriate staff privileges, the hearing panel finds that this, indeed, was a violation of the bylaws. Dr. Heesch freely acknowledged that he undertook these procedures before obtaining appropriate privileges but maintained that he was unaware at the time that he lacked the requisite authority. The committee believes that Dr. Heesch was naïve and careless, but he was not attempting to intentionally flout the bylaws. The committee believes that these violations are significant, but technical, and that a written reprimand would be an appropriate remedy.

8
9
10

PAT 00002 (Ex. J). Thus, a reasonable effort was made to obtain the facts with respect to this charge against Dr. Heesch.

11
12

**(3)     The professional review action was taken after adequate notice and hearing procedures were afforded to the physician.**

13
14
15
16
17
18
19

In connection with the third prong, a health care entity is deemed to have met the adequate notice and hearing requirements of 42 U.S.C. § 11112(a)(3) of the HCQIA with respect to a physician if the physician receives notice of the proposed adverse action, notice of the proposed hearing and if certain procedural requirements are met during the hearing. While 42 U.S.C. § 11112(b) provides this "safe harbor," the statute only requires that hearing procedures be adequate and fair under the circumstances. *Smith v. Ricks*, 31 F.3d 1478, 1486 (9th Cir. 1994).

20
21
22
23
24
25
26
27
28

In this case, Defendants argue that Dr. Heesch received extensive hearing rights, was given an opportunity to appeal the MEC's decision, and that he submitted a written position statement and participated in oral arguments on appeal. Defendants' Memorandum, 23; SOF, ¶¶ 30-35. Defendants claim that all witnesses at Dr. Heesch's hearing were subject to cross-examination. SOF, ¶31; Ex. DD. However, Plaintiffs disagree. Plaintiffs claim that Defendants barred Dr. Heesch from interviewing or deposing witnesses, and thus, true cross-examination did not take place. Objections to

– 53 –

SOF,  ¶ 31.  A similar issue was raised in *Singh*, where the plaintiff physician claimed

that he should have been permitted to discuss his audit with the physician providing the

audit before the hearing.  However, the court held that the HCQIA procedural standard

does not require peer review bodies to guarantee the "accused" such a procedural

safeguard.  *See also Smith,* 31 F.3d at 1487 (9th Cir. 1994) (stating that the HCQIA

does not require "peer review proceedings to look like regular trials in a court of law");

*Singh*, 308 F.3d at 40 ; *Poliner* at *46-47.

Plaintiffs claim that the charges against Dr. Heesch were expanded over time and

that VVMC's most serious charge against Dr. Heesch, that he had lied in public about

medical staff leadership and the administration, was brought against him after the Ad

Hoc Committee hearing, and that Defendant VVMC provided no evidence to support

the charge and finding and denied Dr. Heesch any process at all.  Objections to SOF,

¶31.  A similar issue was considered in *Fobbs v. Holy Cross Health System Corp.*, 789

F. Supp. 1054, 1067-1068 (E.D. Cal. 1992), *rev'd on other grounds*, 29 F.3d 1439 (9th

Cir. 1994), where the plaintiff physician claimed that he was not given notice of

additional cases of his that would be considered.  The court found evidence to the

contrary.  In so doing, the court cited the legislative history of the Act which recognized

that in an investigation, as long as "notice is given in a way that protects the interests of

the physician ... a supplemental notice of such additional decisions might well satisfy

the requirements of due process."  H.R. Rep. No. 093, 99th Cong., 2d Sess. 10, reprinted

in 1986 U.S. Code Cong. & Admin. News 6384, 6394.  Here Dr. Heesch was afforded

notice that the proceeding had been expanded to include his public statements even

though these grounds were later not pursued.  ADM 00235 (Ex. 53)  In any event, the

decision of the Board was based on other grounds.

Defendants also state that, at the end of the hearing, Dr. Heesch was asked

– 54 –

1    whether he had an opportunity to fully present his case, and he agreed that he had. SOF,

2    ¶ 33; Ex. DD at 2721.  However, Plaintiffs claimed that, "though the hearing officer at

3    the Ad Hoc Committee Hearing asked Dr. Heesch whether he had been afforded a fair

4    hearing and the opportunity to present evidence, given the circumstances he had no

5    choice but to agree with the hearing officer or risk poisoning the panel."  Objections to

6    SOF, ¶33.  On the other hand, Plaintiffs did agree with Defendants' statement that Dr.

7    Heesch had submitted a written position statement and participated in oral arguments on

8    appeal.  SOF, ¶ 34 , Objections to SOF, ¶34.

9         Plaintiffs vigorously argue that the Defendants circumvented the

10   recommendation of the Ad Hoc Committee that VVMC grant Dr. Heesch privileges and

11   proposed a "take-it or leave-it" settlement offer that was unacceptable to Dr. Heesch.

12   Plaintiffs' Response, 21. However, the final action was by the Board which took into

13   account the actions of the MEC subsequent to the hearing before the Ad Hoc

14   Committee, as discussed below.

15

16        **(4)    The professional review action was taken in the reasonable belief that**
               **it was warranted by the facts.**

17

18        Finally, the HCQIA clearly grants broad discretion to hospital boards with

19   respect to the fourth prong which is that the action must be taken in the reasonable

20   belief that it was warranted by the facts. *Bryan*, 33 F.3d at 1337.  As the *Bryan* court

21   notes, "The role of federal courts on review of such actions is not to substitute our

22   judgment for that of the hospital's governing board or to reweigh the evidence regarding

23   the renewal or termination of medical staff privileges." *Id.*

24        In this case, however, the Ad Hoc Committee carefully states that, although it

25   agrees with three of the findings of the MEC against Dr. Heesch, it believes that denial

26

27

28                                        – 55 –

1   of privileges is too harsh and recommends a lesser sanction, which the MEC purports to

2   adopt.  The Ad Hoc Committee's recommendation is as follows:

3

4       • While the Medical Executive Committee has substantial and
          reasonable bases supporting the major charges noticed against
5         Dr. Heesch, the Ad Hoc Committee respectfully disagrees
          with the severity of the Medical Executive Committee's
6         recommendations.  Rather than recommending against staff
          privileges in their entirety, this committee recommends that
7         Dr. Heesch's privileges be granted, but only after Dr. Heesch
          has fulfilled the following conditions: A. Counseling on
8         interpersonal relations, as determined to be appropriate by the
          Medical Executive Committee; B. Observation reports
9         reflecting competency at angiograms and angioplasty (as well
          as TEE and permanent pacemaker, should Dr. Heesch decide
10        to apply for these latter two privileges) satisfactory to the
          Medical Executive Committee.  At least five observation
11        reports should be required.

12      • The Ad Hoc Committee further recommends that if Dr.
          Heesch is willing to cooperate with respect to the
13        implementation of the above recommendations, that his
          application for medical staff privileges be placed on hold until
14        and unless he submits a new application which cures the
          defects noted above with respect to the University of
15        Pittsburgh and which appends the necessary observation
          reports and proof of counseling in interpersonal relations.  If
16        Dr. Heesch thus demonstrates himself to be a cooperative
          partner in the remediation of his application, the hearing
17        committee would suggest that this matter be held in abeyance
          with no final resolution by the Board of Trustees until such
18        time as a re-application is submitted.

19      25.   The committee also recommends that a letter of reprimand be
              sent to Dr. Heesch with respect to his violations of the Medical
20            Staff Bylaws as noted above, his disruptive conduct as noted
              above, and his failure to be fully candid in his application for
21            medical staff privileges, as noted above.

22   PAT 00005 (Ex. J).

23       Following this decision, on September 11, 2002, the MEC submitted to Dr.

24   Heesch a Consent Agreement (PAT 00088 (Ex. 62)) which provided:

25       (1)   Entry of a letter of reprimand for (a) performance of four

26   medical procedures at VVMC without privileges; ( b) failure to reveal to

27                                     – 56 –

28

VVMC a prior restriction on his ability to practice; and (c) disruptive conduct at VVMC;

(2)     Amendments to his pending application with full disclosure of all prior experience along with express authorization for full investigation by VVMC;

(3)     Specific proof of his training;

(4)     Counseling in interpersonal skills, including an evaluation by a licensed psychologist and quarterly reports to the Medical Staff;

(5)     Ten observation reports with respect to each of four specific procedures;

(6)     A joint letter from Dr. Heesch and the Chief of Staff to both the Medical Staff and the VVMC Cardiac Cath Lab staff in which Dr. Heesch agreed that he made "statements, both written and oral, that were untrue", that he had made statements that were "demeaning to the Cath lab staff," and that he "exercised poor judgment in making these statements." PAT 00114 (Ex. 62). Dr. Heesch had ten days to accept the Consent Agreement, which was presented as non-negotiable.  (Ex. 61).  Dr. Heesch's counsel was unavailable for 9 of the 10 days, (Exs. 54, 74), and VVMC only granted a 2 day extension which Dr. Heesch's counsel said was insufficient. (Exs. 55; 74).

The conditions in the Consent Agreement were different than those required by the Ad Hoc Committee in at least the following ways:

(1)     Ten rather than five observations in four rather than two cardiology subspecialty procedures were required.

(2)     The findings of a psychological evaluation and quarterly reports would be available to the Medical Staff.

– 57 –

1

2    (3)    Upon completion of the observation requirements, Dr. Heesch would need
            to obtain written approval of the MEC before performing any procedure
3            for which observation is required.

4    (4)    Dr. Heesch was required to sign a letter to the Cath Lab staff and the
            Medical Staff saying that he made untrue oral and written statements.

5    According to Dr. Cowan, who participated in the Ad Hoc Committee, the counseling

6    was meant to be private to Dr. Heesch, (Cowan Dep. 20 (Ex. 70)), although this is not

7    what is stated.  In addition, five observations were deemed adequate to make a

8    determination as to competence.  Cowan Dep. 21 (Ex. 70), although Dr. Mikles testified

9    that "ten observations is a usual requirement when you're performing a new procedure

10   at the institution."  Mikles Dep. 156 (Ex. 51).  However, Dr. Mikles conceded that the

11   observation requirements were "onerous."  *Id.* at 165.  Dr. Jack Cook, who served on

12   the Ad Hoc Committee, stated that the Consent Agreement "closely tracks" the

13   recommendations of the Ad Hoc Committee.  Cook Dep. (Ex. E).

14       Through his attorney, Dr. Heesch objected to these and many other provisions of

15   the Consent Agreement after the 10 day deadline.  (Exs. 54, 74; 75).  His attorney's

16   letters pointed out "internal inconsistencies and ambiguities in the Consent Agreement"

17   which he believed "with some minor tinkering . . . could easily have been resolved to

18   make clear how the agreement was to work." (Ex. 75)

19       While some discretion was left to the MEC in implementing the Ad Hoc

20   Committee's recommendation, a close look at the conditions set forth in the Consent

21   Agreement indicates that they were in fact more onerous than the Ad Hoc Committee's

22   recommendation.  The Ad Hoc Committee stated clearly that it thought the sanctions of

23   the MEC were too severe and that it believed that privileges could and should be

24   granted if certain conditions were met:  interpersonal counseling, five observations in

25   the areas where he sought privileges, a letter of reprimand and complete disclosure on a

26   new application to be submitted.  However, the requirements spelled out in the Consent

27

28                                        – 58 –

Agreement were more burdensome.  Given the position of the MEC, it was up to the

VVMC Board to determine whether the recommended action against Dr. Heesch was

warranted by the facts as known.

Following Dr. Heesch's failure to accept the conditions in the Consent

Agreement within 10 days, on November 18, 2002, the MEC recommended to the

VVMC Board that Dr. Heesch's privileges be denied.  PAT 01423 (Ex. 47).  The

MEC's Written Statement to the VVMC Board explained that

> Due to the adverse findings of the Ad Hoc Committee, the MEC
> could not have simply made a "favorable" recommendation to
> the Governing Body.  Although the MEC is now making an
> "adverse" recommendation, the MEC did give Dr. Heesch an
> opportunity to rectify problems identified by the Ad Hoc
> Committee.  He rejected this proposal.

PAT 01453 (Ex. 47).  The MEC's Written Statement also explains how Dr. Heesch was

presented with this proposal:

> On September 11, 2002 Dr. Heesch was presented with the
> written report of the Ad Hoc committee and a proposed Consent
> Agreement that addressed the concerns of the Ad Hoc
> Committee and made it possible for Dr. Heesch to achieve
> Medical Staff membership.  The proposed Consent Agreement
> required Dr. Heesch to demonstrate the contrition absent in his
> appearance before the Ad Hoc Committee.  This Proposed
> Consent Agreement also outlined a procedure for Dr. Heesch to
> demonstrate his clinical competence and to obtain the
> counseling necessary to address whatever psychological issues
> underlie his disruptive conduct.  Unfortunately, Dr. Heesch
> rejected the Proposed Consent Agreement, claiming that its
> terms were too onerous.  Through counsel, Dr. Heesch also
> claimed that the Proposed Consent Agreement was self
> contradictory.  In fact the proposed Consent Agreement tracked
> the recommendation of the Ad Hoc Committee and provided a
> systematic means for Dr. Heesch to obtain Medical Staff
> membership.

PAT 01451 (Ex. 47).  There was no mention in the Written Statement of the time limit

imposed by the MEC.

On December 3, 2002 the VVMC Board denied Dr. Heesch's privileges.  (Ex.

1    K).  The minutes of the Board meeting indicate that the Appeal Committee was

2    provided with "in excess of 3,000 pages plus exhibits for review . . . attorneys were

3    present, . . . and testimony was presented over 7 ½ hours."  (Ex. K).  The reasons stated

4    by the Board were Dr. Heesch's failure to disclose pertinent information and performing

5    procedures for which he did not have privileges.  The minutes also state that:

6
7                The MEC gave Doctor Heesch conditions to fulfill within a time
              frame in order to obtain privileges.  The time passed without a
8              formal response; the MEC has taken the position that failure to
              respond is tantamount to rejection of its offer.  If additional time
9              were offered by the Board, e.g., another 30 days to accept, his
              attorney has stated it would not matter, it will still be rejected.

10   (Ex. K)

11        In cases like this where a hospital's governing body is faced with conflicting

12   recommendations from the medical staff and the review panel, the question is whether,

13   after a reasonable effort to obtain the facts and procedures that are fair to the physician,

14   there is a reasonable factual basis for the action ultimately taken.  This issue was raised

15   in *Austin*, 979 F.2d at 735, where the recommendations of the Judicial Review

16   Committee ("JRC") differed from the Medical Executive Committee and called into

17   question the reasonableness of the physician's suspension.  However, the court noted

18   that the reasonableness of the suspension was a different  issue than whether  the

19   defendants acted in the reasonable belief that the suspension was warranted.  Given that

20   the JRC had criticized Dr. Austin's performance and imposed conditions on Dr. Austin,

21   the court found that no reasonable jury could find that the hospital had not acted in the

22   reasonable belief that the action was warranted.  *Id.*

23        This issue was also raised in *Bryan*, 33 F.3d at 1329,  where the Board had

24   before it three recommendations – the report of the hospital's executive committee

25   recommending termination of privileges, the hearing panel's report that recommended

26   that his privileges be suspended for two years, and the report of the Board's own review

27
28                                      – 60 –

1    panel recommending termination.  The Board voted unanimously to terminate Dr.

2    Bryan's privileges.  Noting that Congress passed the HCQIA to "reinforce the pre-

3    existing reluctance of courts to substitute their judgment on the merits for that of health

4    care professionals and of the governing bodies of hospitals," the court found that the

5    plaintiff had not established by a preponderance of the evidence that the Hospital Board

6    did not act in the reasonable belief that the termination was warranted.  *Id.* at 1337.  *See*

7    *also, Fobbs*, 789 F. Supp. at 1068-69 (E.D. Cal. 1992)(although concerned about

8    contrary views as to the appropriateness of the monitoring requirements, the court

9    nevertheless found that the defendants maintained an objectively reasonable belief that

10   the monitoring was warranted), *aff'd in part and rev'd in part*, 29 F.3d 1439 (9th Cir.

11   1994); *Ricks v. Smith,* 31 F.3d 1478 (where the hospital board effectively terminated the

12   physician's privileges rather than impose a two-year preceptorship.).  A similar

13   conclusion is appropriate here.

14        **(5)  Reporting to the NPDB and BOMEX**

15        Plaintiffs also complain about the filings that were made to the National

16   Practitioner Data Base ("NPDB") and the "charges" that were filed with Arizona

17   Medical Board of Examiners ("BOMEX") with respect to Dr. Heesch.  The record

18   indicates that VVMC reported its adverse actions against Dr. Heesch to the NPDB on or

19   about December 12, 2002 (Ex. 79).  This filing is required under the Health Care

20   Quality Improvement Act, 42 U.S.C. § 11133(a), which provides that health care

21   entities that take a professional review action that adversely affects the clinical

22   privileges of a physician for a period longer than 30 days must report to the Board of

23   Medical Examiners and the appropriate State Licensing Board the name of the

24   physician, a description of the acts or reason for the action, and any other information

25   the Secretary of Health requires.  The failure on the part of the entity to report will result

26

27

28                                            – 61 –

1  in loss of the immunity from damages provided by the HCQIA.  *Id.* at § 11133(c).  If a

2  physician has some objection with respect to these filings, the HCQIA provides

3  the affected physician with procedures to consider any disputed accuracy of the

4  information.  *Id.* at § 11136; 45 C.F.R. § 60.14. There is no indication in the record that

5  any objection was filed by the Plaintiffs as to the accuracy of the reports, although there

6  was a statement added to the report on behalf of Dr. Heesch on January 11, 2004. (*See*

7  Ex. 79)

8         The HCQIA confers immunity on any person who makes a report under the

9  HCQIA "without knowledge of the falsity of the information contained in the report."

10  *Id.* at § 11137 (c). Immunity for reporting exists as a matter of law unless there is

11  evidence for a jury to conclude the report was false and the reporting party knew it was

12  false. Plaintiffs argue that the filing with the NPDB was false because there was no

13  additional or separate finding by the VVMC Board that Dr. Heesch engaged in "fraud

14  and deceit" as checked on the NPDB form.  However, a careful review of the NPDB

15  instructions and the action codes available to a health care entity filing an adverse action

16  with the NPDB[28] indicate that the "narrative is to provide support for the Basis for

17  Action Codes."  So the starting point is the selection of the action codes.  VVMC's

18  selection of "AB" for "practicing beyond the scope of privileges" as the "basis for

19  action" on the form and "E4" for "fraud, deceit or material omission in obtaining license

20  or credentials" as "other, as specified" on the form correctly tracked the two findings of

21  the VVMC Board that Dr. Heesch had failed to disclose pertinent information on his

22  application for privileges and had performed procedures for which he did not have

23  privileges.  The narrative of "the reasons for action taken" on the form then correctly

24

_____

25       [28] See generally National Practitioner Data Bank Healthcare Integrity and
26  Protection Data Bank, Basis for Action Codes – Individual Subjects, and Fact Sheet on
   Submitting a Factually Sufficient Narrative Description.
27

28                                           – 62 –

provides further elaboration of these bases.  Thus, this is different from the situation in *Brown v. Presbyterian Healthcare Services*, 101 F.2d 1324 (10th Cir. 1996), where the court found that the data bank report of incompetency was false and the defendant knew of its falsity.

VVMC also filed a report with the Arizona Board of Medical Examiners ("BOMEX") following the Medical Executive Committee's decision to deny Dr. Heesch's application (Ex. 58) and then later in 2002 with respect to failing to disclose information in his licensing application to BOMEX (Ex. 72).  Under Arizona law, the chief executive officer or chief of staff of a hospital is required to inform the BOMEX if the privileges of a doctor in that hospital are denied or limited because of a doctor's action that appears to show that the doctor may be guilty of "unprofessional conduct." A.R.S. § 32-1451(B).  "Unprofessional conduct" is defined broadly to include:

> (q)      Any conduct or practice that is or might be harmful or dangerous to the health of the patient or the public . . .;
>
> (t)      Knowingly making any false or fraudulent statement, written or oral, in connection with the practice of medicine or if applying for privileges or renewing an application for privileges at a health care institution.

*Id.* at A.R.S. § 32.1401.27(q), (t).  A person who reports in good faith is not subject to civil liability.  *Id.* at A.R.S. § 32-1451 (B).

In the first filing (MD-02-0043) with the BOMEX (Ex. 58), VVMC alleges the findings of its Medical Executive Committee on December 18, 2001 (Exs. I, 44).  The BOMEX investigated and in June, 2002, determined that Dr. Heesch had not violated the Medical Practice Act of Arizona.[29]  VVMC 00491 (Ex. 68)[30]; ADM 00012 (Ex. 69).

---

[29]  VVMC appealed this dismissal on June 28, 2002.  (Ex. 57).

[30]  The letter of June 20, 2002 from BOMEX to VVMC also notes:  "The letter of suspension is an internal matter, subject to further review at Verde Valley Medical Center

– 63 –

1    In the second filing (MD-03-0280)(Ex. 72  ) VVMC alleges that during his licensing

2    application to BOMEX Dr. Heesch failed to disclose information concerning "the

3    termination of his privileges at Oakland VA Medical Center and University of

4    Pittsburgh Medical Center in 1996." (Exs. J; 53)  The BOMEX investigated and in

5    December, 2003, determined that Dr. Heesch had not violated this Act.  CHMD 00053

6    (Ex. 59).  Thus, Dr. Heesch was exonerated by the BOMEX with respect to all charges,

7    but this does not necessarily mean, as Plaintiffs argue, that VVMC should not have

8    made these reports or that they were not made in good faith or that Dr. Heesch did not

9    fail to disclose the requested information in his application for privileges at VVMC.[31]

10         In sum, participants in a professional review action are immune from liability for

11   monetary damages arising out of that action as long as that action meets the four

12   conditions laid out in 42 U.S.C. § 11111(a)(1) (2000).  In order to overcome the HCQIA

13   presumption of immunity, a plaintiff challenging the professional review action must

14   show by a preponderance of the evidence that one of the four conditions in 42 U.S.C. §

15   11111(a)(1) (2000) was not met.  In challenging such a professional review action, the

16   peer reviewer's state of mind is immaterial and the plaintiff physician's conduct can

17   relate to unprofessional behavior with respect to medical competence, disruptiveness or

18   failure to follow hospital policies.  Finally, the issue of HCQIA immunity should be

19   resolved as early as possible in the litigation process, which usually means it is resolved

20   at the summary judgment stage.  Based on the facts presented, the Defendants are

21   _____

22   and, when completing its review process, may notify BOMEX if Dr. Heesch's permanent
     privileges are denied."
23        [31]   The specific questions in his licensing application were No. 7:  Have any
24   disciplinary actions, restrictions, limitations ever been taken against you while you were
     participating in any type of training program or by any health care provider?  No. 12:
25   Have you ever had hospital privileges revoked, denied, suspended or restricted in any
26   way?  See Ex. 72.  It is important to note that these questions are different from the
     questions asked in his application for privileges at VVMC.  See Ex. 15.
27

28                                        – 64 –

1  entitled to HCQIA immunity for damages under federal and state law for any claims

2  based on the professional review action against Dr. Heesch since Plaintiffs have not met

3  their burden of showing by a preponderance of the evidence that Defendant VVMC's

4  peer review actions were not in the furtherance of quality health care or that Dr. Heesch

5  was not afforded adequate notice or hearing procedures or that the Defendant's hospital

6  board did not act in the reasonable belief that its action was warranted.

7  **X.    State Law Claims**

8       Because all of the federal antitrust claims are resolved, there is a question

9  whether this Court should exercise its discretion to dismiss the remaining state law

10 claims.  Under 28 U.S.C.A. § 1367 (c)(3), a district court may decline to exercise

11 supplemental jurisdiction over state-law claims if "the district court has dismissed all

12 claims over which it has original jurisdiction."

13      In making its determination, the court should take into account generally

14 accepted principles of "judicial economy, convenience, and fairness to the litigants."

15 *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  However, when the statute

16 of limitations has run on the supplemental claim, precluding the filing of the separate

17 suit in state court, dismissal may not be fair.  *See Rodriguez v. Doral Mortg. Corp.*, 57

18 F.3d 1168, 1177 (1st Cir. 1995) ("The running of the statute of limitations on a pendent

19 claim, precluding the filing of a separate suit in state court, is a salient factor to be

20 evaluated when deciding whether to retain supplemental jurisdiction.").  Given that

21 substantial judicial resources have already been committed to this case, sending the case

22 to another court will cause an unnecessary duplication of effort and could potentially

23 leave Plaintiffs without a remedy.  *Growth Horizons, Inc. v. Delaware County, Pa.*, 983

24 F.2d 1277 (3d Cir. 1993) ("[I]f the dismissal of the main claim occurs late in the action,

25 knocking [the dependent claims] down with a belated rejection of supplemental

26

27

28                                          – 65 –

jurisdiction may not be fair.") (internal quotations and citations omitted).  This court therefore elects to retain the state law claims and will address them in the following order: (1) tortious interference, (2) defamation and injurious falsehood, (3) breach of contract and breach of the implied covenant of good faith and fair dealing, (4) wrongful institution and maintenance of a non-governmental administrative proceeding, and (5) fundamental fairness and due process.

As with the federal claims, on these state law claims on a motion for summary judgment, the Court views the facts and all reasonable inferences in the light most favorable to the non-moving party.  *Wells Fargo Bank v. Ariz.  Laborers Local 395 Pension Trust Fund*, 201 Ariz. 474, 482 P. 13, 38 P.3d 12, 20 (2002).  Summary judgment is appropriate "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the plaintiffs." *Neonatology Associates, Ltd. v. Phoenix Perinatal Associates, Inc.*, 216 Ariz. 185, 188-89, 164 P.3d 691 (2007).

(A)    **Tortious Interference**

Plaintiffs allege that Defendants tortiously interfered with the following business contracts or prospective business relationships: (1) a contractual employment relationship between Dr. Heesch and Cardiac Care; (2) a contractual employment relationship between Dr. Kumar Ravi and Cardiac Care; (3) a prospective business relationship between Northern Arizona Radiology, P.C. and Plaintiffs; (4) business and contractual relationships between Plaintiffs and their patients; (5) a contractual relationship between Plaintiffs and Blue Cross/Blue Shield; and (6) a prospective business relationship between Yavapai Regional Medical Center ("YRMC") and Dr. Heesch. CAC, ¶ 138.

A person who intentionally and improperly interferes with a contract between a party and a third person by inducing or otherwise causing the third person not to conform to the contract is subject to liability to the other. *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 388, 710 P.2d 1025 (1985) (citing Restatement (Second) of Torts § 766); *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 427, 909 P.2d 486 (Ariz. App. 1995). In order to establish tortious interference with a contractual relationship, the following elements must be proven. First, the plaintiff must prove the existence of a valid contractual relationship. Second, it must be shown that the defendant had knowledge of the contract. Third, intentional interference by the defendant must be shown to have induced or caused a breach or termination of the contract. Fourth, the defendant must have acted improperly. Fifth, the resulting damages to the plaintiff must be shown. *Id.* at 386 (citing *Antwerp Diamond Exchange of America, Inc. v. Better Bus. Bur.*, 130 Ariz. 523, 530, 637 P.2d 733 (1981)); *Pasco v. Talco Recycling, Inc.*, 195 Ariz. 50, 62, 985 P.2d 535 (1999); *Barrow v. Arizona Board of Regents*, 158 Ariz. 71, 78, 761 P.2d 145 (Ariz. App. 1988). Generally, the issue of motive or the propriety of an action is one of fact and not law, but the court may resolve the issue as a matter of law when there is no reasonable inference to the contrary in the record. *Neonatology Associates, Ltd. v. Phoenix Perinatal Associates, Inc.*, 216 Ariz. 185, 188, 164 P.3d 691 (2007).

(1) Contractual Employment Relationship with Dr. Heesch

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim of tortious interference with Cardiac Care's contractual employment relationship with Dr. Heesch because (1) the proceedings at VVMC involving Dr. Heesch occurred in 2002 and thus their claims are time barred; (2) Plaintiffs have failed to show that Defendants' actions were improper as to motive or means; and (3) Arizona law does not

1   allow for damages from peer review proceedings under any circumstances.  Defendants'

2   Memorandum, 24-26, 28.

3        The statute of limitations on a claim for tortious interference in Arizona is two

4   years. A.R.S. § 12-542; *Clark v. Airesearch Mfg. Co. of Arizona, Inc.*, 138 Ariz. 240,

5   243 (Ariz. 1983).  Since the Complaint was filed on April 14, 2005, the deadline for

6   accrual of a cause of action for tortious interference in this matter was April 14, 2003.

7   However, Plaintiffs argue that their claim for tortious interference did not accrue until

8   after the deadline because Defendants' improper motive could not have been reasonably

9   known to them until after Defendants' improper actions in attempting to coerce Dr. Ravi

10  to leave Cardiac Care's employment as a precondition to receiving privileges at VVMC.

11   Plaintiffs' Response, 25.  Under the "discovery rule," a plaintiff's cause of action does

12  not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should

13  know the facts underlying the cause of action. *Gust, Rosenfeld & Henderson v.*

14  *Prudential Ins. Co. of Am.*, 182 Ariz. 586, 588 (Ariz. 1995).  *See also Doe v. Roe*, 191

15  Ariz. 313, 323, 955 P.2d 951, 961 (1998)(while an injured person "need not know all

16  the facts underlying a cause of action to trigger accrual . . .[,] the plaintiff must at least

17  possess a minimum requisite of knowledge sufficient to identify that a wrong occurred

18  and caused injury").  In this case, Plaintiffs would have known of any improper conduct

19  during the appeal of the decision denying Dr. Heesch's privileges, which was prior to

20  April 2003.  Therefore, the only question is whether Plaintiffs were aware of

21  Defendants' motives and whether those motives were improper.  Plaintiffs claim that

22  they did not become aware of Defendants' motives until VVMC began reviewing Dr.

23  Ravi's performance, but Defendants claim that Plaintiffs were aware of the economic

24  considerations by VVMC during the appeals hearing itself.  Indeed, Dr. Patel himself

25  claims that Dr. O'Connor made it clear to him about the time that Dr. Heesch was

26

27

28                                              – 68 –

coming to VVMC that he would do "everything in his power" to prevent Dr. Patel from developing a cath lab. Patel 7/24/06 Dep. at 187 (Ex. 6); *See also* ADM 000009-10 (Ex. 58) (where Dr. Patel questions VVMC's motives). Thus, Plaintiffs' claim of Defendants' tortious interference with Dr. Heesch's contract with Cardiac Care is barred by the Arizona statute of limitations.

Furthermore, "interference with contractual relations is not inherently tortious. Liability will be found only where the interference is improper 'as to motive or means.'" *Emplrs. Reinsurance Corp. v. GMAC Ins.*, 308 F. Supp. 2d 1010, 1015 (D. Ariz. 2004), citing *Wagonseller*, 147 Ariz. at 388, 710 P.2d at 1043 (Ariz. 1985). Arizona has adopted the definition of "improper" behavior from the Restatement (Second) of Torts § 766 (1979). *Wagonseller*, 147 Ariz. at 388, 710 P.2d at 1043. A finding of "improper" conducts requires consideration of: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests that were defeated, (4) the interests that the actor sought to advance, (5) the social interests involved, (6) the proximity of the actor's conduct to the interference, and (7) the relationship between the parties. *Id.* at 387. Among these *Wagonseller* factors, "the nature of the actor's conduct and the actor's motive" deserve the most weight. *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 494, 38 P.3d 12, 32 (Ariz. 2002). "Conduct specifically in violation of statutory provisions or contrary to public policy may . . . make an interference improper." *Id.* However, a reasonable, good faith belief in the legality of the conduct weighs against a finding of "improper" conduct. *See G.M. Ambulance and Medical Supply Co., Inc. v. Canyon State Ambulance, Inc.*, 153 Ariz. 549, 739 P.2d 203 (App. 1987). In addition, a business driven motive, in and of itself, is not an improper motive. *Neonatology Associates Ltd*, 216 Ariz. 185, 164 P.3d 691 (2007).

1    Plaintiffs argue that they have provided ample evidence of both improper means,

2  CSOF ¶¶ 80-221, and improper intent or motive, CSOF ¶¶ 72-79, 208-09, 212-14, 218,

3  221, 236-37, 241-60, 389.  However , Plaintiffs' claim with respect to Dr. Heesch is

4  based on a hospital's privilege decision for which Defendants are entitled to immunity

5  from damages under the HCQIA, 42 U.S.C. § 11111, and the Arizona peer review

6  statute, A.R.S. § 36-445.02.  Therefore, Defendants' Motion for Summary Judgment on

7  Plaintiffs' claim for tortious interference with its contractual employment relationship

8  with Dr. Heesch is granted.

9    (2)  <u>Contractual Employment Relationship with Dr. Ravi</u>

10    Defendants argue that they are entitled to summary judgment on Plaintiffs' claim

11  of tortious interference with Cardiac Care's contractual employment relationship with

12  Dr. Ravi because Plaintiffs have not shown that the alleged intentional interference by

13  the Defendants induced or caused the termination of Dr. Ravi's employment contract

14  with Plaintiffs.  Further, they argue that Plaintiffs have failed to show that Defendants'

15  actions were improper as to motive or means. Defendants' Memorandum, 24-26.

16    Defendants point to evidence that Dr. Ravi had active staff privileges at VVMC

17  until he resigned. Patel 7/25/06 Dep. at 283; Ravi Dep. at 78 (Ex. M).  Further, they

18  state that Dr. Ravi's employment relationship ended, not after he resigned his VVMC

19  active privileges in September 2004 (Exs. O, V), but months later in late March 2005

20  (Ex. AA), "one week" after Dr. Ravi informed Dr. Patel that he wished to move to

21  Phoenix. Ravi Dep. at 63 (Ex. M).  The reasons Dr. Ravi chose to move to Phoenix

22  were not his loss of VVMC privileges, but rather "better schools for the girls, Jyotsna

23  (his wife) would not have to commute, and [Dr. Ravi] would have more time with his

24  family." RH006212 (Ex. AA); Ravi Dep. at 62-63 (Ex. M); SOF ¶ 41.  Defendants also

25  argue that, if this Court finds that no antitrust violation has occurred, the tortious

26

27                                     – 70 –

28

1   interference claim must fail as well because as a result Plaintiffs will have failed to

2   show that Defendants' actions were improper as to motive or means.

3        In response, Plaintiffs argue that Dr. Ravi was approached by hospital

4   administrators James Sinek, VVMC's President, and Dr. Michael O'Connor, VVMC's

5   Vice President of Medical Affairs, and offered a *quid pro quo* with respect to his

6   privileges – *i.e.*, Dr. Ravi's privileges would be granted if, and only if, he left his

7   employment with Cardiac Care and joined VVH, VVMC's preferred cardiology

8   practice.  When Dr. Ravi declined to terminate his employment with Cardiac Care, the

9   physicians who had "observed" Dr. Ravi's trial procedures (coincidentally Defendant

10  Drs. Peek and Dwyer) suddenly developed "concerns" with Dr. Ravi's procedures that

11  would require significant additional observation.  Based on the *quid pro quo* that he had

12  been offered, and his knowledge of the problems encountered by Dr. Heesch, Dr. Ravi

13  concluded that he would never be able to obtain privileges at VVMC while employed

14  by Cardiac Care, and so informed Dr. Patel. (Ex. 29); Ravi. 9/9/06 Dep. at 106-113,

15  134-137 (Ex. 28); CSOF ¶¶ 210-221.  Plaintiffs argue that such facts prove not only

16  intentional interference that resulted in Dr. Ravi's termination of his employment

17  agreement with Cardiac Care, but also prove improper motive and means on behalf of

18  Defendants.

19       Both of these factual scenarios are plausible.  Viewing the facts in the light most

20  favorable to Plaintiffs, this Court finds that the evidence presents a genuine dispute as to

21  two elements of the tort -- intentional interference with Dr. Ravi's privileges that led to

22  a termination of the employment contract and improper purpose.  Therefore,

23  Defendants' Motion for Summary Judgment on Plaintiffs' claim for tortious

24  interference with its contractual employment relationship with Dr. Ravi is denied.

25       (3)  Prospective Business Relationship with Northern Arizona Radiology P.C.

26

27                                          – 71 –

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim of tortious interference with their prospective business relationship with Northern Arizona Radiology P.C. ("NAR") because Plaintiffs have no admissible evidence that Defendants induced the termination of the relationship. Defendants' Memorandum, 25. Plaintiffs present a letter from NAR to Dr. Patel dated March 13, 2006, as evidence that (1) Plaintiffs had a prospective business relationship with NAR and were involved in negotiations pursuant to which NAR would contract with Plaintiffs to provide radiology services to Plaintiffs in Cottonwood and (2) NAR ultimately withdrew from contract negotiations with Plaintiff after VVMC discovered the ongoing negotiations and threatened to interfere with NAR's business relationship and contract in Flagstaff if NAR reached agreement with Plaintiffs. CSOF, ¶ 391. However, that letter does not provide sufficient evidence of intentional interference by VVMC that VVMC induced or caused a breach or termination of the contract, nor that VVMC acted improperly. That letter simply states that:

> ... timing has hurt us in this potential venture. We [NAR] have invested a great deal of time and money into our developing center here in Flagstaff, and at this time are spread somewhat thin in regards to finances and manpower. The administration here has the potential to jeopardize our center until the final documentation is complete on or near June 1, 2006. The administration and board members have approached our group regarding our involvement in Cottonwood. We know that you are motivated to have your imaging center developed as quickly as possible. In light of these factors, we do not feel that we can be a valuable partner in your center. We have the fear that we could potentially slow down your progress and potentially jeopardize what we are trying to accomplish here in Flagstaff.

(Exs. BB; 141) Based on these facts, no reasonable jury could find that the Defendants had interfered with the Plaintiffs' prospective business relationship with NAR. Thus, Defendant's Motion for Summary Judgment on Plaintiffs' claim for tortious interference with their prospective business relationship with NAR is granted.

1

2          (4)  <u>Plaintiffs' Business and Contractual Relationships with Cardiac Care's</u>

<u>patients</u>

3

4          Defendants argue that they are entitled to summary judgment on Plaintiffs' claim

of tortious interference with their patients because (1) Plaintiffs fail to identify specific

5

individuals with whose relationships Defendants interfered, Defendant's Memorandum,

6

25; and (2) there was no intentional interference by Defendants that induced or caused a

7

breach or termination of Plaintiffs' relationship with these patients because Plaintiffs

8

fail to present any evidence that these patient relationships were in fact terminated, as

9

required for a tortious interference claim under *Locricchio v. Legal Services Corp.*, 833

10

F.2d 1352, 1357 (9th Cir. 1987)(recovery for tortious interference denied where

11

discharged employee failed to show any specific potential relationship with employers

12

or that his former employer's actions were the direct cause of his failure to obtain

13

employment). Defendants' Reply, 13.

14

          With respect to the identity of specific individuals, Dr. Patel cites several patients

15

who told him that they were told either that they should not visit Dr. Patel or that Dr.

16

Patel was not competent.  Patel 7/25/06 Dep. at 411-17 (Ex. Z).  However, Dr. Patel

17

does not indicate that these patients ceased to see him and thus there can be no

18

interference that caused a breach or termination of Dr. Patel's relationship with these

19

patients.  Dr. Patel does indicate that some of his patients were lost to Drs. Dwyer and

20

Peek; however, he does not indicate that these patients were lost as a result of improper

21

conduct by Defendants that occurred within the statute of limitations.  Patel 7/24/06

22

Dep. at 71-73 (Ex. A).  Moreover, as the court noted in *Neonatology Associates*, 216

23

Ariz. 185, 188 -89,  a business-driven motive in and of itself is not an improper motive.

24

Similarly, any patients lost to Cardiac Care because Dr. Patel voluntarily withdrew his

25

privileges is also not due to any interference by Defendants but due to Dr. Patel's own

26

27

28                                          – 73 –

action.  Even Dr. Patel testified that Cardiac Care continued to treated the patients that were sent to Phoenix for catheterizations after they came back from their single procedure in Phoenix. Patel 7/24/06 Dep. at 73-74 (Ex. A) (stating that he has not lost any patients to Arizona Heart Institute, the place where his patients go for interventional procedures).  As noted above, any claim for patients lost to Cardiac Care because of Dr. Heesch's denial of privileges in December 2002 is barred by the statute of limitations.[32]  Because Plaintiffs fail to provide facts within the statute of limitations sufficient to show that any alleged intentional interference by the Defendants induced or caused a breach or termination of Plaintiffs' relationship with patients, Defendants' Motion for Summary Judgment on Plaintiffs' claim for tortious interference with Plaintiffs' business and contractual relationships with their patients is granted.

(5)  <u>Contractual Relationship with Blue Cross/Blue Shield</u>

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim of tortious interference with Cardiac Care's contract with Blue Cross/Blue Shield because Plaintiffs' claim is time barred, as the events took place "four years [or] five years" prior to Dr. Patel's July 25, 2006 deposition.  Defendants' Memorandum, 24; Patel 7/25/06 Dep. at 408 - 410 (Ex. Z); SOF ¶ 48.  The statute of limitations on a claim for tortious interference in Arizona is two years. A.R.S. § 12-542; *Clark v. Airesearch Mfg. Co. of Arizona, Inc.*, 138 Ariz. 240, 243 (Ariz. 1983).  It is undisputed that the Complaint was filed on April 14, 2005 and that the deadline for accrual of a cause of action for tortious interference in this matter was April 14, 2003. Plaintiffs' Response, 23.  Plaintiffs fail to show that their cause of action for tortious interference with

---

[32] As noted above, viewing the facts in a light most favorable to Plaintiffs, there are genuine issues of material fact with respect to whether Defendants interfered with Dr. Ravi's contract with Cardiac Care and any of those patients.

Cardiac Care's contract with Blue Cross/Blue Shield accrued after the April 14, 2003 deadline under the appropriate statute of limitations.

Additionally, Defendants argue that Plaintiffs have no evidence that any damage was caused by this alleged interference with the Blue Cross contract. Defendants' Memorandum, fn. 9. Dr. Patel specifically testified that about four or five years ago he was advised by Blue Cross that it had been advised that he had dropped his privileges from active to consulting and that this was then corrected. *Id.* Dr. Patel himself acknowledged that once the information with Blue Cross/Blue Shield was clarified, he had no further problems. Patel 7/25/06 Dep. at 411 (Ex. Z). Thus, Plaintiffs are unable to establish the damages element of a claim for tortious interference with a contractual relationship. Defendants' Motion for Summary Judgment on Plaintiffs' claim for tortious interference with Plaintiffs' contractual relationship with Blue Cross/Blue Shield is granted.

(6) Dr. Heesch's Prospective Business Relationship with YRMC

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim of tortious interference with Dr. Heesch's prospective business relationship with Yavapai Regional Medical Center ("YRMC") because Plaintiffs have failed to show that Defendants' actions were improper as to motive or to means. Defendants' Memorandum, 25-26.

The record shows that on April 25, 2003, VVMC responded to a letter from YRMC dated April 23, 2003 with respect to the status of Dr. Heesch's privileges with VVMC. (Ex. 73) This letter is based on the submissions to the National Practitioner Data Base (Ex. 79) and the State of Arizona (Ex. 72), which are required by federal and state law. 42 U.S.C. § 11133; A.R.S. § 32-1451(B). Plaintiffs argue that the letter falsely stated that the VVMC Board denied Dr. Heesch's application for privileges

because "he had previously lost hospital privileges and medical staff membership" and because he had engaged in "disruptive conduct."

While all of the details with respect to Dr. Heesch's incident involving his privileges and employment at the University of Pittsburgh Medical Center and the VA Hospital are not part of this record,[33] this record indicates that Dr. Heesch sued the hospital for wrongful termination (Ex. 47 at 27-28). Exhibits submitted during the Ad Hoc Committee hearing confirm this litigation, PAT00009, Exs. 53-62 (Ex. Y), and suggest that his employment was voluntarily or involuntarily terminated. Ex. 55, 62 (Ex. Y). Based on this record, both the Ad Hoc Committee and the VVMC Board found that his ability to practice was "restricted." The Ad Hoc Committee was "convinced by Dr. Heesch's complaint, deposition testimony and by correspondence, including the letter dated April 9, 1996, that Dr. Heesch's ability to practice at the University of Pittsburgh Medical Center and the VA Hospital was restricted." PAT 00004 (Ex. J). The Board's resolution specifically requests the Medical Staff to issue a letter of reprimand to Dr. Heesch for "Dr. Heesch's failure to disclose to VVMC a prior restriction of his clinical privileges." (Ex. K at 3) In addition, VVMC's second filing with BOMEX (Ex. 72) alleges Dr. Heesch's failure to disclose to BOMEX the termination of his privileges at Oakland VA Medical Center and the University of Pittsburgh Medical Center, but Dr. Heesch was exonerated by BOMEX on December 15, 2003 (Ex. 59), which was after the decision of the VVMC Board and after the letter to YRMC. Thus, while it is clear that Dr. Heesch's employment was voluntarily or involuntarily terminated, it is not clear from the record that Dr. Heesch "lost hospital privileges and medical staff membership" as stated in the letter to YRMC.

---

[33] The complete record before the Ad Hoc Committee was not submitted as part of the record on this Motion.

1       There is also a material issue of fact as to whether the statement in the letter that
2   "the Governing Body had concluded that Dr. Heesch had engaged in disruptive conduct
3   while exercising his temporary privileges" is misleading and therefore indicative of
4   improper motive and means.  The record does indicate that his temporary privileges
5   were revoked by Dr. Owens, then President of VVMC, after the Medical Executive
6   Committee had found "evidence of disruptive behavior" as one reason to reject Dr.
7   Heesch's application (Ex. 44), but on appeal on December 3, 2002, the Board did not
8   find Dr. Heesch to be disruptive when it considered his application for permanent
9   privileges.  The Board's resolution specifically noted that "the Board's decision to deny
10  is reached independently from the charge of alleged disruptive conduct."  (Ex. K at 3)

11      Dr. Heesch admits that, in considering his application for privileges, YRMC
12  could not make a decision about his application until the Arizona Board of Medical
13  Examiners had decided VVMC's complaint.  Heesch 7/27/06 Dep. at 14 (Ex. G to
14  Defendants' Reply).  On June 22, 2003 and then again on December 23, 2003, the
15  BOMEX exonerated Dr. Heesch from the charges (Exs. 69; 59); CSOF ¶¶ 200-01.  But
16  it is unclear what effect the letter of April 25, 2003 had on YRMC's decision.[34]
17  Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' claim for
18  tortious interference with Plaintiffs' prospective contractual relationship with YRMC is
19  denied.

20  **(B)**   **Defamation and Injurious Falsehood**
21      Plaintiffs allege that Defendants, through their executives, employees, and
22  medical staff acting in the course and scope of their employment, made various
23

24  _____

25  [34] It appears that at trial Plaintiffs may be required to show that Dr. Heesch's
    inability to obtain privileges at YRMC was the "direct result" of this letter. *Locricchio*,
26  833 F.2d 1358.  As the court noted in *Locricchio*, any damages to Dr. Heesch as a result
    of this letter may be more properly redressed under his claim for defamation. Id.
27
28

statements concerning Plaintiffs Dr. Patel and Cardiac Care that give rise to both their Defamation and Injurious Falsehood claims.  As articulated by the Plaintiffs,[35] these include:

(1) statements about Dr. Patel being a "disruptive physician" that were directed to nurses and other hospital staff, including on at least one occasion during a pacemaker procedure at VVMC in June 2004;[36]

(2) statements regarding unnamed" disruptive physicians" were made by Dr. Michael O'Connor, then VVMC's VPMA, during a medical conference in the presence of peer physicians;

(3) communications made by VVMC to Blue Cross/Blue Shield in approximately 2001/2002 regarding Dr. Patel's lack of privileges at the hospital and lack of affiliation with VVMC;

(4) statements made by Dr. James Arthur, who served as Vice Chief of Staff and Chief of Staff of VVMC to patients, and in particular Ms. Esther Baker, regarding Dr. Patel's loss of privileges at VVMC;

(5) communications made by Ms. Janell Anthony, the Cardiopulmonary Services Director of VVMC, in approximately 2001/2002 to other peer physicians in which she referred to Dr. Patel as "incompetent," and "unable to practice cardiology," or perform cardiology services;

(6) statements made by Dr. Dwyer while serving as Medical Director of Cardiology at VVMC, that Dr. Patel was "incompetent" and that he did not want Dr. Patel to receive cardiac cath privileges at VVMC;

(7) statements made by Dr. Peek in April 2006 to Robert Carabell, a patient of

---

[35] Plaintiffs' Responses to Defendants' First Set of Interrogatories (Ex. CC); CSOF ¶¶ 382-390.
[36] Defendants have not moved for summary judgment with respect to this statement.

– 78 –

Dr. Patel, that Dr. Patel is "incompetent," did not have privileges at VVMC, and that if Carabell got sick while he was Patel's patient, he would "die along the way to Phoenix";

(8) statements by a VVMC staff member in approximately 2002/2003 to Carol Rydberg that Dr. Patel had lost his privileges, could no longer see patients at VVMC, and did not work with the local hospital;

(9) statements about Dr. Heesch being a "disruptive physician" and manufactured allegations regarding Dr. Heesch's competence in connection with Dr. Heesch's application for privileges;

(10) false and derogatory statements regarding Dr. Heesch's competence and professionalism to the Arizona Medical Board and National Practitioner Data Bank; [37] and

(11) false statements in the letters from VVMC to YRMC dated April 25, 2003 (Ex. 73), the Alabama State Board of Medical Examiners dated September 8, 2003 (Ex. 80), and the Mobile Infirmary Medical Center dated November 17, 2003 (Ex. 81) indicating that VVMC had rejected Dr. Heesch's application for permanent privileges because "Dr. Heesch failed to disclose to VVMC that he had previously lost hospital privileges and medical staff membership" and because "Dr. Heesch had engaged in disruptive conduct while exercising his temporary privileges at VVMC." CAC, ¶¶ 212-220.[38]

---

[37] Defendants also correctly note that these statements (9) and (10) during the privileges hearing of Dr. Heesch are immune under HCQIA and A.R.S. § 32-1451.

[38] It is unclear whether Defendants have moved for summary judgment with respect to these statements. They refer to "defamatory statements" made about Dr. Heesch "during the peer review process," and to "all state law claims", which presumably would include Plaintiffs' Count XVIII pertaining to these letters. Defendants' Memorandum, 27.

1

2        **(1)    Statute of Limitations**

3          Under Arizona law, the statute of limitations for defamation and injurious

4   falsehood is one year. *See* A.R.S. § 12-541.  Arizona's general defamation rule provides

5   that a defamation action accrues -- and the statute of limitations begins to run -- upon

6   publication. *Boatman v. Samaritan Health Services, Inc.*, 168 Ariz. 207, 812 P.2d 1025,

7   1031 (App. 1990). Defendants argue that the following statements are time barred by

8   the statute of limitations:

9          (3) communications made by VVMC to Blue Cross/Blue Shield in approximately

10  2001/2002;

11         (4) statements made by Dr. James Arthur, who served as Vice Chief of Staff and

12  Chief of Staff of VVMC to patients, and in particular Ms. Esther Baker, regarding Dr.

13  Patel's loss of privileges at VVMC;[39]

14         (8) statements by a VVMC staff member in approximately 2002/2003 to Carol

15  Rydberg;

16         (9) statements about Dr. Heesch being a "disruptive physician" and

17  manufactured allegations regarding Dr. Heesch's competence in connection with Dr.

18  Heesch's application for privileges; and

19         (10) statements regarding Dr. Heesch's competence and professionalism to the

20  Arizona Medical Board (Exs. 58-59; 68-69, 71-72) and the National Practitioner Data

21  Bank (Ex. 79). Defendants' Memorandum, 26-7.

22         Since the Complaint was filed on April 14, 2005, the deadline for accrual of a

23  cause of action for defamation and injurious falsehood in this matter was April 14,

_____

24         [39] Dr. Patel testified in his deposition that these statements were made 1-3 years ago.
25  Patel 7/24/06 Dep. at 411 (Ex. Z).  Combined with the fact that the record is not clear as to
    when Dr. Patel had consulting and active privileges and that the Plaintiffs have made no

26

27                                    – 80 –

28

1   2004. Plaintiffs' Response, 28.  Plaintiffs fail to show that their cause of action for

2   defamation and injurious falsehood with regard the above identified statements accrued

3   after the April 14, 2004 deadline under the appropriate statute of limitations.  In

4   reviewing the record, it is also apparent to the Court that (5) communications made by

5   Ms. Janell Anthony in approximately 2001/2002 to other peer physicians is also barred

6   by the one year statute of limitations.

7        Although it is not clear from the pleadings the exact date that some of these

8   statements were made, courts are not obligated to "scour the record in search of a

9   genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

10   (citation omitted); *see Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026,

11   1029 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th

12   Cir. 1988). Rather, courts rely on "the nonmoving party to identify with reasonable

13   particularity the evidence that precludes summary judgment." *Keenan,* 91 F.3d at 1279;

14   *Best Western Int'l, Inc. v. Furber*, 2008 U.S. Dist. LEXIS 70552, *22-23 (D. Ariz. Sept.

15   5, 2008). In this case, not only have Plaintiffs failed to identify the dates that the above

16   statements were made, Plaintiffs have failed to address these statements at all.

17   Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' claim for

18   defamation and injurious falsehood based on the above identified statements is granted.

19        The letters from VVMC to YRMC dated April 25, 2003 (Ex. 73), the Alabama

20   State Board of Medical Examiners dated September 23, 2003 (Ex. 80), and the Mobile

21   Infirmary Medical Center dated November 17, 2003 (Ex. 81) are not barred by the

22   statute of limitations because Dr. Heesch claims he did not know about them until

23   discovery in this litigation.  (Dkt.# 261, Transcript of Hearing dated 2/4/09 at 5-6)

24       **(2)     Elements of Claim for Defamation**

25

26   effort to clarify this (*See* Patel 7/24/06 Dep. at 292-93 (Ex. Z); Exs. 88-97; 102), this claim

27

28                                           – 81 –

1

2      The tort of defamation requires (1) a false and defamatory statement concerning

3      the plaintiff, (2) an unprivileged publication of the statement to a third party, (3) fault on

4      the part of the publisher, and (4) either presumed or actual damages. *See* Restatement

5      (Second) of Torts § 558 (1977); *Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 1, 730

6      P.2d 178, 180 & n.1 (App. 1985) (citing Restatement § 558); *Burns v. Davis*, 196 Ariz.

7      155, 993 P.2d 1119, 1126 (App. 1999) ("Arizona views the Restatement as authority for

8      resolving questions concerning rules in defamation cases.").[40]

9      Defendants have moved for summary judgment on statement (2) regarding

10     *unnamed* "disruptive physicians" that were made by Dr. Michael O'Connor, then

11     VVMC's VPMA, during a medical conference in the presence of peer physicians.

12     Defendants' Memorandum, 26.  Defendants argue that Plaintiffs allege that Dr.

13     O'Connor made defamatory statements that never specifically mentioned any Plaintiff,

14     and that therefore there is no evidence that anyone in particular was defamed.  Plaintiffs

15     do not specifically address this argument in their Response Brief. Response Brief, 27-8.

16      However, the test is whether the defamer knew that the communication would be

17     understood by the recipient to refer to the Plaintiff, or was negligent in failing to

18     recognize that this might happen. Restatement (Second) of Torts § 564, Comment f.

---

is barred.

[40] The elements of a cause of action for injurious falsehood are substantially similar to that of defamation.  A plaintiff states a valid cause of action for "injurious falsehood" by alleging that the defendant made a statement or statements: (1) to a third party, i.e., "published," (2) knowing that the statement or statements were false (3) in an effort to persuade the third party from dealing with the plaintiff (4) that resulted in a pecuniary loss to the plaintiff. *See, e.g., W. Techs., Inc. v. Sverdrup & Parcel, Inc.*, 154 Ariz. 1, 4, 739 P.2d 1318, 1321 (App. 1986) (citing William Prosser et al., Prosser & Keaton on the Law of Torts § 128, at 963 (5th ed. 1984), and Restatement § 623A). Arizona permits an action for injurious falsehood based on a derogatory statement regarding "the plaintiff's business." *Aldabbagh v. Ariz. Dept of Liquor License and Control*, 162 Ariz. 415, 421, 783 P.2d 1207, 1213  (App. 1989).

– 82 –

1  Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' claim for

2  defamation and injurious falsehood based on statements regarding unnamed "disruptive

3  physicians" that were made by Dr. Michael O'Connor is denied.

4      Defendants have moved for summary judgment on (6) -- statements made by Dr.

5  Dwyer while serving as Medical Director of Cardiology at VVMC, that Dr. Patel was

6  "incompetent" and that he did not want Dr. Patel to receive cardiac cath privileges at

7  VVMC (7/25/06 Patel Dep. 415-16 (Ex. 6)); and (7) -- statements made by Dr. Peek in

8  April 2006 to Robert Carabell, a patient of Dr. Patel, that Dr. Patel is "incompetent," did

9  not have privileges at VVMC, and that if Carabell got sick while he was Patel's patient,

10  he would "die along the way to Phoenix." Defendants' Memorandum, 27.  Defendants

11  argue that these statements are opinion statements and thus, not actionable. *Id.*  In

12  response, Plaintiffs' point out that Defendants, as experts in the medical and cardiology

13  fields, asserted that Dr. Patel was not a competent cardiologist and that under these

14  circumstances, such allegations are not mere opinion or hyperbole, but instead imply

15  knowledge of Dr. Patel's skill as a cardiologist and, therefore, this issue should be left

16  for the jury. Plaintiffs' Response, 27, fn. 21.

17      The court determines whether a communication is capable of bearing a particular

18  meaning, and whether that meaning is defamatory. Restatement (Second) of Torts § 614

19  (1977).  If so found, the jury then determines whether the defamatory meaning was

20  actually conveyed. *Burns v. Davis*, 196 Ariz. 155, 993 P.2d 1119, 1129 (Ariz. App. Ct.

21  1999); *Canez v. Gastelum*, 2006 U.S. Dist. LEXIS 14116, *5 (N.D. Ariz. Mar. 27,

22  2006).[41]  Further, "in most instances, it is for the jury to determine whether an ordinary

23

24  _____

25      [41] Similarly, in an action for injurious falsehood, the court determines whether the
statement is capable of a disparaging or other injurious meaning; and if so, the jury

26  determines whether the statement complained of was understood by the recipient as
disparaging or otherwise injurious. Restatement (Second) of Torts, § 652(1)(a) and (2)(a).

27

28                      – 83 –

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

reader or listener would believe the statement to be a factual assertion, mere opinion or hyperbole." *Id.* "The meaning of words and statements should not be construed in isolation; rather, consideration should be given to the context and all surrounding circumstances, including the impression created by the words used and the expression's general tenor." *Id.* This Court finds that Defendants' statements regarding Dr. Patel's incompetence could have been considered a factual assertion by an ordinary listener considering Defendants' positions as experts in the medical and cardiology fields, and thus these alleged statements are capable of bearing a defamatory or injurious meaning and this determination is best left to the jury. Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' claim for defamation and injurious falsehood based on statements by Dr. Dwyer and Dr. Peek as outlined above is denied.

(C)     **Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing**

Defendants argue that Plaintiffs' breach of contract and implied covenant of good faith and fair dealing claims fail because they have failed to identify any specific provisions of the VVMC bylaws that have been violated. Instead of contesting the legal basis for this assertion, Plaintiffs respond by citing to two paragraphs of their Controverting Statement of Facts (Dkt.# 183 ¶¶ 380-81) and stating that "the Bylaws contained a number of explicit and implicit due process provisions that were violated by VVMC in this matter." Neither of the cited paragraphs identifies a specific provision of the VVMC bylaws that has been violated. Instead, the two paragraphs in turn cite to Exhibit 139, which contains all of VVMC's bylaws. The Plaintiffs also state that the bylaws generally require "the privileges process and related appeals to take place in an expeditious manner," and that they implicitly agree to "make decisions on applications

– 84 –

for privileges based on proper considerations relating to a physician's qualifications and competence." (Dkt.#183-4 ¶¶ 380, 381)

Upon careful review, however, the VVMC bylaws do not afford plaintiffs relief. Essentially, the bylaws set forth in relevant part VVMC's application process for privileges and protect VVMC from liability. Art. VI, dealing with applications for medical staff appointments, requires, among other things, for the applicant to provide

> (e)   A detailed description of the applicant's record including information regarding any denial, revocation, voluntary or involuntary limitations, loss, reduction or resignation, failure to renew, suspension, or modification of medical staff membership and/or clinical privileges at another hospital or health care institution, or any voluntary or involuntary relinquishment, surrender, denial, revocation, suspension, or failure to renew membership, licensure or registration in any professional organizations, specialty board certifications, governmental licensing agency or the Federal Drug Enforcement Administration (DEA).

VI.A.2.(b)(2)(e).  In addition, by applying the applicant understands and agrees that

> 4(a)  Neither the Hospital, nor its representatives, nor the Medical Staff, nor its representatives, shall be subject to legal action for damages or other relief for any action taken on any statements or recommendations made in connection with any applicant or member of the Medical Staff.

Art VII.A.4(a). A practitioner is not entitled to any procedural rights for termination of temporary privileges. Art X.A. Non-reviewable transactions for permanent privileges include "denial of membership and privileges for failure to give complete and accurate information in an application for membership or privileges as required by the bylaws." Art XI.H.  The timeframe for the hearing process is set forth in detail in Art XIII.

– 85 –

1    However, the time periods may be altered by the President "when appropriate."  Art.

2    XIII.J.

3           While Plaintiffs have argued that VVMC did not act in good faith in the hearing

4    process, Plaintiffs do not address any of these provisions in the bylaws and in particular

5    have not articulated how the findings of the MEC, and then the Ad Hoc Committee, and

6    then the VVMC Board that Dr. Heesch failed to provide required information on his

7    application and performed procedures beyond the scope of his privileges were not

8    accurate and made in good faith.

9           In light of these provisions and given that Plaintiffs have wholly failed to cite a

10   specific provision of the alleged contract that supports a breach by Defendants or to

11   challenge Defendants' assertion that they are required to provide a specific citation,

12   summary judgment is granted in Defendants' favor on this claim.

13          **(D)    Wrongful Institution and Maintenance of a Non-Governmental**

14                 **Administrative Proceeding**

15          Defendants argue that Plaintiffs' claim for wrongful institution of a civil

16   proceeding must fail because no Arizona court has ever recognized such a cause of

17   action when the proceeding was held by a non-governmental body.  (Dkt.#169 at 28-29)

18    Plaintiffs respond that because Arizona follows the Restatement, a claim should be

19   recognized.  They cite to the comments to Restatement (Second) of Torts § 680, which

20   provides  that the section is applicable "if the board has the power to revoke or to

21   suspend the license of the person against whom the proceedings are brought."

22   However, this comment appears to be referring to *governmental* administrative

23   proceedings.  Even if the Medical Executive Board had the power to suspend Dr.

24   Heesch's *privileges* to practice at VVMC, it lacked the power to revoke or suspend his

25   medical license.  Plaintiffs do not argue that they mean this cause of action to apply to

26   the VVMC's reporting of Dr. Heesch's suspended privileges to BOMEX, but even if

27

28                                     – 86 –

they had made this argument, VVMC actually had a duty to report the suspension under A.R.S. § 32-1451(B).  In any case, this Court declines to be the first court to recognize such a cause of action under Arizona law.  Accordingly, Defendants' motion for summary judgment as to this claim is granted.

       **(E)**     **Due Process and Fundamental Fairness**

Defendants have also moved for summary judgment on Plaintiffs' due process claim.  Plaintiffs claim that the procedures for Dr. Heesch's hospital privileges violated Dr. Heesch's due process rights and were fundamentally unfair.  Defendants correctly point out that due process only applies to government proceedings.  Moreover, the "fundamental fairness" claim ignores A.R.S. § 36-445.02, which like the HCQIA, protects the integrity of the medical peer review process by immunizing from liability the committee and its members from damages claims arising out of the performance of the committee's duties.  The statute further provides that no injunctive relief may be awarded if the record shows that the committee's actions are "supported by substantial evidence." A.R.S. § 36-445.02(B).  As discussed above in the HCQIA section, the decision to revoke Dr. Heesch's privileges is supported by the record.  Thus, Defendants motion for summary judgment on this claim is granted.

**XI.**    **Conclusion**

To summarize, Defendants' motion for summary judgment regarding federal and state antitrust claims for monopolization, attempted monopolization, and tying is granted on three separate bases: (1) Plaintiffs' failure to adequately define the geographic market, (2) Plaintiffs' failure to demonstrate the type of injury to competition (rather than merely to competitors) that is required by antitrust law, and (3) Defendants' immunity from damages for actions related to the professional review under the HCQIA (although this would admittedly not cover Plaintiffs' requested

– 87 –

injunctive relief if it were the sole basis for granting the motion).  Defendants' motion for summary judgment regarding federal and state antitrust claims for attempted monopolization and conspiracy to monopolize is also granted because of Plaintiffs' failure to prove a specific intent to monopolize.

Defendants' motion for summary judgment regarding Plaintiffs' claims for tortious interference is likewise granted except for the claims of VVMC's tortious interference with (1) Cardiac Care's contractual relationship with Dr. Ravi and (2) with respect to Dr. Heesch's prospective employment at YRMC and the Mobile Infirmary Medical Center based on the letters from VVMC to each of them.  Defendants' motion for summary judgment regarding Plaintiffs' claims for defamation and injurious falsehood is granted except to the extent that these claims relate to (1) statements regarding unnamed" disruptive physicians" were made by Dr. Michael O'Connor, then VVMC's VPMA, during a medical conference in the presence of peer physicians, (2) statements made by Dr. Dwyer while serving as Medical Director of Cardiology at VVMC, that Dr. Patel was "incompetent" and that he did not want Dr. Patel to receive cardiac cath privileges at VVMC;  (3) statements by Dr. Peek in April 2006 to Robert Carabell, a patient of Dr. Patel, that Dr. Patel was "incompetent," did not have privileges at VVMC, and that if Carabell got sick while he was Patel's patient, he would "die along the way to Phoenix"  and (4) statements in the letters from VVMC to YRMC dated April 25, 2003 (Ex. 73), the Alabama State Board of Medical Examiners dated September 8, 2003 (Ex. 80), and the Mobile Infirmary Medical Center dated November 17, 2003 (Ex. 81) indicating that Dr. Heesch had failed to disclose that he had previously lost hospital privileges and medical staff membership and that  the Governing Body of VVMC had revoked Dr. Heesch's temporary privileges because

– 88 –

"Dr. Heesch had engaged in disruptive conduct while exercising his temporary privileges at VVMC."

Defendants' motion for summary judgment on Plaintiffs' claims for breach of contract, breach of implied covenant of good faith and fair dealing, wrongful institution and maintenance of a non-governmental administrative proceeding, due process and fundamental fairness claims is also granted.

**Accordingly,**

**IT IS HEREBY ORDERED** granting Defendants' Motion for Summary Judgment (Dkt.#169) in part and dismissing the following claims from this litigation: (1) Monopolization (both federal and state, including Counts II and VII of the CAC, Dkt.#202), (2) Conspiracy to Monopolize (both federal and state, including Counts III and VIII of the CAC, Dkt.#202); (3) Attempted Monopolization (both federal and state, including Counts IV and IX of the CAC, Dkt.#202), and (4) Tying (both federal and state, including Counts I and VI of the CAC, Dkt.#202).

**IT IS FURTHER ORDERED** granting Defendants' Motion for Summary Judgment (Dkt.#169) as to Plaintiffs' claims for tortious interference (Count V of the CAC, Dkt.#202) except insofar as this claim relates to  (1) tortious interference with the contractual relationship of Dr. Ravi with Plaintiffs (referenced at ¶ 138 (b) of the CAC, Dkt.#202) and (2) tortious interference with the prospective business relationship with Yavapai Regional Medical Center (referenced at ¶ 138 (f) of the CAC, Dkt. #202).

**IT IS FURTHER ORDERED** granting  Defendants' Motion for Summary Judgment (Dkt.#169) regarding Plaintiffs' claims for defamation and injurious falsehood (Counts X, XI, and XVIII of the CAC, Dkt.#202) except to the extent that these claims relate to statements (1) regarding unnamed "disruptive physicians" made by Dr. Michael O'Connor during a medical conference in the presence of peer

– 89 –

physicians; (2) by Dr. Dwyer while serving as Medical Director of Cardiology at VVMC, that Dr. Patel was "incompetent" and that he did not want Dr. Patel to receive cardiac cath privileges at VVMC; (3) by Dr. Peek in April 2006 to Robert Carabell, a patient of Dr. Patel, that Dr. Patel was "incompetent," did not have privileges at VVMC, and that if Carabell got sick while he was Patel's patient, he would "die along the way to Phoenix."; and (4) in the letters from VVMC to YRMC dated April 25, 2003, the Alabama State Board of Medical Examiners dated September 8, 2003, and the Mobile Infirmary Medical Center dated November 17, 2003 indicating that Dr. Heesch failed to disclose that he had previously lost hospital privileges and medical staff membership and that the Governing Body of VVMC had revoked Dr. Heesch's temporary privileges because "Dr. Heesch had engaged in disruptive conduct while exercising his temporary privileges at VVMC."

**IT IS FURTHER ORDERED** granting Defendants' Motion for Summary Judgment (Dkt.#169) regarding Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing (Counts XII and XIII of the CAC, Dkt.#202), wrongful institution and maintenance of a non-governmental administrative proceeding (Count XIV of the CAC, Dkt.#202), due process and fundamental fairness claims (Count XV of the CAC, Dkt.#202).

**IT IS FURTHER ORDERED** setting this matter for a status hearing on May 4, 2009 at 4:00 PM to set a final pretrial conference date and a trial date on the remaining claims.

/ / /

1   **IT IS FURTHER ORDERED** directing the Clerk of the Court to unseal this

2   Order on April 14, 2009, unless counsel file a notice of opposition to unsealing the

3   Order prior to that date.

4   Dated this 31st day of March, 2009.

5

6

7

8   _____
    Mary H. Murguia
9   United States District Judge

10

11

12

13

14   cc: all counsel

15

16

17

18

19

20

21

22

23

24

25

26

27

28